B–RIGHT TRUCKING COMPANY, Appellant,

v.

INTERSTATE PLAZA CONSULTING et al., Appellees.

[Cite as B–Right Trucking Co. v. Interstate Plaza Consulting, 154 Ohio App.3d 545, 2003-Ohio-5156.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 03 MA 15.

Decided Sept. 26, 2003.

548

B–Right Trucking Company, for appellant.

David Zych and Thomas Zych, for appellees.

Vukovich, Judge.

{¶ 1} Plaintiff-appellant, B–Right Trucking Company, appeals the judgment of the Mahoning County Common Pleas Court that granted summary judgment in

favor of Comdata Network, Inc. We are presented with issues concerning the propriety of summary judgment and the award of attorneys fees on Comdata's counterclaim. For the following reasons, the grant of summary judgment in favor of Comdata on B–Right's claim is affirmed, the grant of summary judgment in favor Comdata on its counterclaim is affirmed, but the amount of attorneys fees awarded is affirmed in part and reversed in part, and the cause is remanded.

## STATEMENT OF FACTS

{¶ 2} Comdata is a nationwide company that, among other things, assists trucking companies in advancing money to their truckers at various truck stops throughout the nation. Comdata had contracts with the Pilot station in Girard, Ohio and the 76 Truck Stop in Youngstown, Ohio. The contracts allowed these stations to accept codes from truckers, print corresponding "comcheks," and cash these comcheks for the truckers. Comdata also had a credit contract with B–Right Trucking, allowing the trucking company to advance money to its drivers by issuing codes.

{¶ 3} From mid 1994 through late 1997, Gayle Carino, an employee at B–Right Trucking, issued codes to herself in the name of Kirby Miller, a former trucker for B–Right. Carino would give these codes to the two truck stops named above, sign comcheks in Miller's name, and receive cash. The amounts were typically between $100 and $300 and totaled over $150,000 over the life of her scheme. Carino was arrested in early 1998, sentenced to a year in federal prison, and ordered to pay restitution to B–Right Trucking in the amount of $158,245.

{¶ 4} On May 11, 2000, B–Right Trucking filed suit against Carino, Pilot Corporation, the 76 Truck Stop, and unknown officers and shareholders of 76. On February 27, 2001, B–Right filed an amended complaint changing the defendants related to 76 Truck Stop and adding Comdata as a defendant. A second amended complaint was then filed in April to correct yet another naming error.

{¶ 5} The first count of B–Right's complaint alleged that Carino committed fraud in concert with the two truck stops, which knew or should have known that Carino was acting outside the scope of her authority. The second count of the complaint alleged that the truck stops were negligent and that such negligence could be imputed to Comdata, as the truck stops were its agents. The third count set forth a claim for breach of contract by all defendant companies. The fourth count contended that Comdata was negligent by not detecting and preventing against the fraud. The fifth and final count set forth a claim for breach of warranty by all defendant companies. B–Right sought compensatory and punitive damages and attorneys fees.

{¶ 6} The contract between B–Right and Comdata was attached to the complaint. Notably, the contract stated that B–Right agreed to hold Comdata harmless for liability from acts of B–Right's employees or agents. The contract also stated that B–Right agreed to accept full responsibility for all purchases and to notify Comdata immediately of any lost or stolen codes, concluding that B–Right shall be fully responsible for unauthorized or fraudulent use.

{¶ 7} Comdata filed a motion to dismiss, which was denied. Thereafter, at the February 22, 2002 pretrial, the court gave Comdata until March 1 to file its answer and counterclaim. The docket does not show that an answer and counterclaim were filed. However, the docket does show that on March 19, B–Right filed a reply to Comdata's counterclaim. (As we explain infra, the trial court later amended the docket to show that an answer was filed.) Then, on April 24, 2002, Comdata filed two motions for summary judgment. Comdata's first motion sought summary judgment on B–Right's claims, and Comdata's second motion sought summary judgment on its own counterclaim.

{¶ 8} In support of its motion for summary judgment on B–Right's claim, Comdata alleged that the claims are barred under the UCC because B–Right failed to examine Comdata's daily statements to discover the theft. Comdata also argued that the contract clearly precluded any recovery by B–Right. Comdata then urged that there exists no action for negligent performance of a contractual duty. Finally, Comdata alleged that the breach of warranty claim was barred by the statute of limitations and an express disclaimer in the contract. Comdata attached and referenced the depositions of B–Right's controller, the affidavit of a Comdata investigator, the contract between itself and B–Right, the deposition of Carino, the deposition of B–Right's director of electronic data processing and management information systems, and the deposition of another B–Right employee.

{¶ 9} In support of its motion for summary judgment on its own counterclaim, Comdata argued that pursuant to the language of the contract with B–Right, B–Right was obligated to indemnify it for any losses, including attorneys fees, costs, and expenses incurred as a result of this action. Comdata quotes paragraphs 11 and 19 of the contract wherein B–Right assumes all responsibility for purchases made with the codes and wherein B–Right holds Comdata harmless for liability resulting from the acts of B–Rights employees or agents. Comdata also quotes paragraph 25, which states:

{¶ 10} "**Attorney's Fees.** [B–Right] agrees to pay reasonable attorney's fees to [Comdata] in the event that [Comdata] shall engage an attorney to enforce, protect, preserve or defend any rights it might have under this Agreement."

{¶ 11} Comdata then supplemented its memorandum based upon discovery information. In this supplementation, Comdata noted that B–Right was not a

third-party beneficiary of the contract between itself and the truck stops. Comdata pointed out that B–Right previously stated in interrogatories that it discovered Carino's fraud in November 1997 but now claims the fraud was not discovered until February 12, 1998. Comdata notes that the action was not filed against it until February 27, 2001, more than three years after even the latest date set forth by B–Right. Comdata then stated that the UCC places a three-year statute of limitations on claims relating to actions for conversion of negotiable instruments. Comdata also stated that the UCC gave B–Right only one year from the date of the receipt of the statements from Comdata to discover its employee's theft.

{¶ 12} Notably, B–Right dismissed the two truck stops from the action, albeit without prejudice. On May 14, 2002, B–Right opposed Comdata's motions for summary judgment. In its opposition memorandum, B–Right stated that its contract with Comdata was like a credit-card agreement with the comcheks issued to the drivers acting like the credit checks often sent to credit-card holders. B–Right notes that such "checks" do not draft against its deposit account but instead increase the balance of its outstanding credit. B–Right then concluded that the comchek account is not characterized by negotiable instruments, and thus, contrary to Comdata's arguments, the UCC does not apply.

{¶ 13} B–Right also complained that Comdata cannot produce certain sight drafts to prove that all the amounts paid were actually incurred by B–Right. Thus, B–Right urged that it was overbilled by $44,782. Note that although this is not a claim in the complaint, B–Right argued in its opposition memorandum that Comdata should be liable for these missing sight drafts, which Comdata insisted were in the possession of the United States Attorney General.

{¶ 14} Next, B–Right quoted from the contracts that exist between Comdata and the truck stops. Paragraph 4 of these contracts states that the truck stop must require presentation of a valid driver's license and enter the driver's license number and payee's home phone number on the draft. The contracts also give Comdata the right to have any payment to the truck stop returned to it if the truck stop failed to complete any of the procedures in paragraph 4, if the transaction is in dispute, or if there has been negligence, fraud, or dishonesty on the part of the truck stop in processing a transaction which results in the failure or refusal of Comdata's customer to make a payment to Comdata. B–Right noted that both truck stops violated the contract with Comdata by failing to ask for a driver's license and home phone number, pointing to Carino's deposition testimony where she states that she wrote a driver's license number and address on the draft but was never asked for identification.

{¶ 15} B–Right then claimed that the contract between itself and Comdata cannot absolve Comdata of liability because it has a duty of good faith regardless

of the terms of the contract. Because the contract states that Tennessee law would apply, B–Right cited such case law speaking of the implied duties of good faith and fair dealing. B–Right also cited an Ohio Supreme Court case holding that a bank cannot exonerate itself from its duty of inspection in the collection of instruments.

{¶ 16} In response to Comdata's argument that B–Right should have inspected the daily statements, B–Right argued that the statements were too confusing to interpret and cited the deposition testimony of its head of data processing. Finally, B–Right set forth one sentence disputing that Comdata was entitled to summary judgment on its counterclaim.

{¶ 17} Comdata then responded that the type of instrument is irrelevant to B–Right's duty to inspect the statements to discover fraud. They claim that all that is required is for Comdata to be "engaged in the business of banking" and to "make available to a customer a statement of account." Tenn.Code 47–4–406(a). Comdata noted that B–Right claims that the statements were confusing but used these same statements to finally discover Carino's theft. Comdata also noted that B–Right has previously admitted that the items at issue are negotiable instruments, citing to B–Right's opposition to Comdata's prior motion to dismiss. Comdata cited Tenn.Code 47–3–405 for the proposition that an employer is prohibited from collecting on an instrument fraudulently endorsed by an employee who has authority to control disposition of such instruments. Comdata also cited the fictitious-payee rule, Tenn.Code 47–3–404, to bar B–Right.

{¶ 18} On May 28, 2002, the trial court entered its decision. First, the court agreed that Tennessee law applied. Second, the court found that the transactions involved negotiable instruments and based this conclusion on B–Right's admissions in its amended complaint and its opposition to the motion to dismiss. Thus, the court concluded that all transactions are governed by the Uniform Commercial Code of Tennessee.

{¶ 19} As to the first claim in the complaint, the court recited Comdata's arguments regarding a one-year statute of limitations and failure to exercise the requisite care under Tenn.Code 47–4–406(c), (d)(2), and (f). The court noted that B–Right does not address these statutory preclusions because it was too busy disputing that the transactions involved negotiable instruments. We should note that B–Right's first claim did not concern Comdata.

{¶ 20} As to the second and fourth claims, the court reviewed Comdata's argument that B–Right is precluded as a matter of law from bringing a negligence action where the alleged negligent conduct deals with the performance of a contract, noting that Comdata cited both Ohio and Tennessee law. The court then found that B–Right's response to summary judgment completely ignored Comdata's argument.

{¶ 21} As to the third claim in the complaint, the court found that B–Right was not an intended third-party beneficiary of the contracts between Comdata and the truck stops. The court then found that the contract between Comdata and B–Right was not violated under any of the assertions set forth by B–Right. The court also found that the hold-harmless clause was express and not violative of any public policy. The court likewise stated that the indemnification language, upon which Comdata's counterclaim is based, was valid.

{¶ 22} As to the fifth claim in B–Right's complaint, the court reviewed Comdata's argument that this claim was precluded by statute of limitations and express disclaimer. The court pointed out that B–Right did not respond to this argument.

{¶ 23} Finally, the court granted Comdata's motion for summary judgment on B–Right's claims and granted Comdata's motion for summary judgment on Comdata's counterclaim with a hearing to be scheduled on the amount of attorneys fees. The hearing was held in November 2002. In the meantime, judgment was entered for B–Right against Carino for $156,837.68. Thereafter, on January 10, 2003, the court granted judgment to Comdata in the amount of $133,049.53. B–Right filed timely notice of appeal from this judgment.

## ASSIGNMENT OF ERROR NUMBER ONE

{¶ 24} B–Right sets forth three assignments of error. The first assignment of error provides:

{¶ 25} "The trial court erred, to the prejudice of B–Right, when it ruled within its May 28, 2002 order, as a matter of law, that B–Right could not recover from Comdata for any of the comchek amounts previously paid by B–Right."

{¶ 26} This assignment of error is broken into two subassignments, the first of which asks: "Did the trial court commit error when it ruled, as a matter of law at summary judgment, that Comdata was [not] liable for the sight drafts it could not produce?"

{¶ 27} Although the subassignment omits the word "not," we presume this is what B–Right meant to say. This argument deals with the allegation that Comdata could not produce approximately $44,782 worth of sight drafts in discovery. Comdata stated that the United States Attorney still had these documents from the criminal investigation of Carino. Comdata's brief states that these documents have since been received by B–Right after B–Right finally contacted the United States Attorney.

{¶ 28} As Comdata states, the trial court did not make a ruling that B–Right was or was not liable for this amount, as this issue was not before the trial court. B–Right had already paid Comdata for all of the comcheks issued. B–Right's

complaint made no mention that it was seeking $44,782.00 for checks it paid but believed were never cashed by Carino or anyone else. Rather, the complaint sought repayment of all checks cashed by Carino. B–Right mentioned this allegation in their response to Comdata's motion for summary judgment. However, there was never a claim for recovery of this amount, and thus when the court granted summary judgment, it was not ruling on this issue. Accordingly, this subassignment is overruled.

{¶ 29} The second subassignment queries: "Did the trial court error [sic] when it ruled, as a matter of law at summary judgment, that Comdata was not liable for the negligent payment of those comchek sight drafts that were produced?"

{¶ 30} B–Right divides its argument into three sections: the alleged breach of the implied contractual duty of good faith contained within the contract between Comdata and B–Right; the allegation that B–Right was a third party beneficiary to the contracts between Comdata and the truck stops; and the statute of limitations issue. We shall begin with B–Right's argument that summary judgment was improper because Comdata breached an implied covenant of good faith.

{¶ 31} B–Right first states that the truck stops violated the clause in their contracts with Comdata which requires them to ask for a driver's license and write the payee's driver's license number and phone number on the comchek. B–Right states that although the contract between itself and Comdata excludes liability for acts of B–Right's employee, Comdata cannot absolve itself from dealing in good faith. B–Right then concludes that Comdata breached its duty of good faith to B–Right when the truck stop breached its contractual duty to Comdata.

{¶ 32} In Tennessee, as in Ohio, there exists a common law duty of good faith which is implied in the performance of contracts. *Wallace v. Natl. Bank of Commerce* (1996), 938 S.W.2d 684, 686. What the duty of good faith consists of depends upon the language of the contract in each case which leads to an evaluation of reasonable expectations of the parties. Id. See, also, *Ed Schory & Sons, Inc. v. Society Natl. Bank* (1996), 75 Ohio St.3d 433, 443, 662 N.E.2d 1074 (where the Ohio Supreme Court explains that the duty of good faith refers to an implied covenant not to take opportunistic advantage in a way that could not have been contemplated at the time of contract drafting). If one acts in accordance with the statutory and contractual rights, then there is no bad faith. *Burton v. Hardwood Pallets, Inc.* (Tenn.Ct.App.), 2001 WL 1589162.

{¶ 33} Here, B–Right sued for breach of contract, never mentioning breach of implied covenant of good faith in the complaint. Regardless, a breach of this implied covenant by Comdata is unascertainable.

{¶ 34} There is no dispute that a driver's license number and address were recorded on the relevant comcheks. Whether this number was placed there by a truck stop employee or Carino is irrelevant for purposes of Comdata's liability. Since the number was written on the comcheks, Comdata remained unaware that the truck stop may have failed to ask for a driver's license. As for the lack of a phone number, such fact is not written on a driver's license, and thus, the inclusion of a phone number would not have revealed that Carino was not the payee.

{¶ 35} B–Right has not supported their allegation that Comdata breached a duty of good faith merely by alleging that the two truck stops may have failed to ask its customers for identification, which is a term of the contract between Comdata and the truck stops. This leads into B–Right's next issue presented; that is, the truck stops breached their contract with Comdata.

{¶ 36} We now turn to the second subissue under the second subassignment of error presented in the first assignment of error. If this sounds confusing, let it be a signal to appellant as to the clarity of the structure of its brief. This subissue contends that summary judgment was improper because B–Right was a third-party beneficiary to the contract between Comdata and the truck stops. First, we note that B–Right did not allege a third-party-beneficiary theory until appeal; at least such theory is not specified in the complaint or in its response to summary judgment.

{¶ 37} Even if B–Right is an intended third-party beneficiary of the contract between the truck stops and Comdata, it is the truck stops that are claimed to have breached the contract, not Comdata. A promisor is the one who manifests his intention to be bound by the promisee, and the promisee is the one to whom the manifesting is addressed. Restatement of the Law 2d, Contracts (1981), Section 2(2) and (3). In determining whether a person is an intended or an incidental third-party beneficiary, the promisee's intent in securing the promise from the promisor is often considered. *Owner–Operator Indep. Drivers Assn., Inc. v. Concord EFS, Inc.* (Tenn.2001), 59 S.W.3d 63, 71 (following the Restatement's rules on third-party beneficiaries and holding that plaintiff could have challenged the contested surcharges directly to the bank).

{¶ 38} Here, the truck stops manifested their intent to be bound by a promise to ask for identification and record the driver's license number. The truck stops allegedly failed to fulfill their promise as the promisor to Comdata as the promisee. It is the promisor who allegedly breached the contract. The fact that Comdata did not enforce a provision, which may have allowed them to collect the funds paid to Carino from the truck stops is not a breach of the terms of the contract. Thus, Comdata was not the proper defendant in a breach-of-contract

action by the third-party beneficiary plaintiff on this particular theory of recovery. Rather, B–Right should not have dismissed the truck stops if it wished to pursue an intended third-party beneficiary breach-of-contract theory for failure to require identification.

{¶ 39} This brings us to the third subissue presented under the second subassignment, which falls under appellant's first assignment of error. B–Right contests the trial court's holding concerning the three-year statute of limitations. Specifically, B–Right contends that the trial court should not have accepted Comdata's arguments that the case involved commercial paper and negotiable instruments and thus the UCC. Instead, B–Right characterizes the action as a simple breach-of-contract action. B–Right argues that the UCC "has no application to a contract for recovery on a line of credit." Thus, B–Right concludes that the applicable statute of limitations is ten years, citing Tenn.Code 28–3–109(c), which provides a ten-year statute of limitations on demand notes. B–Right reasons that the line of credit transactions herein most closely resemble demand notes. B–Right then states that even if we disagree with this argument, the statute of limitations should be no less than that stated in Tenn.Code 28–3–109(a)(3), which provides six-year limitations period for actions on contracts not otherwise provided for.

{¶ 40} First, we should point out that in Comdata's motion for summary judgment, it only sought summary judgment on the three-year statute of limitations grounds on B–Right's fifth claim, for breach of warranty, which was asserted against Comdata and the two truck stops. The two truck stops are no longer in this suit. Thus, this subissue actually only deals with summary judgment on the breach of warranty claim asserted against Comdata.

{¶ 41} Nevertheless, the trial court determined that the UCC governed the transactions at issue. The court held that B–Right could not argue that the transactions involved negotiable instruments in its amended complaint and its opposition to Comdata's motion to dismiss and then change its argument when it realized that the UCC contained features which negated its claims. Specifically, B–Right stated in its opposition to dismissal, "Obviously, the transactions at issue involve negotiable instruments under the Uniform Commercial Code." Hence, it appears that the trial court could properly find waiver of the issue by B–Right.

{¶ 42} Moreover, B–Right's argument is based upon a theory that the com-cheks are analogous to the checks sent to customers by credit-card companies, rather than regular checks. However, this is a meaningless distinction for purposes of whether the UCC applies. Both checks can be issued to a payee by a drawer to be drawn on a bank. In fact, B–Right's merely speaking of warranties in its fifth claim, bolsters Comdata's claim that the UCC applies as B–Right makes no allegation that it is speaking of some warranty other than the ones

contained in the UCC such as transfer and presentment warranties. Instead, after sarcastically stating that this is not a warranty involved in the sale of an item, B–Right stated in its opposition to dismissal, "Clearly, the warranties at issue in the within action have to do with those of issuers, drawers and drawees of instruments under Article 3 of the Uniform Commercial Code, and not those for purchasers of goods under Article 2." As such, B–Right is bound by its admission that the UCC (and thus its statute of limitations apply).

{¶ 43} We finally note that under this analysis, even if B–Right were correct in claiming that the UCC is inapplicable, B–Right would be conceding that it no longer wished to maintain the fifth claim in its complaint, which revolves around a UCC cause of action. Accordingly, this subissue is without merit. Under the preceding analysis, B–Right's first assignment of error, its two subassignments, and its three subissues are all overruled.

## ASSIGNMENT OF ERROR NUMBER TWO

{¶ 44} B–Right's second assignment of error provides:

{¶ 45} "The trial court erred, to the prejudice of B–Right, when it ruled within its May 28, 2002 order, as a matter of law, that B–Right was liable to Comdata for the payment of Comdata's attorneys' fees and litigation expenses."

{¶ 46} First, B–Right argues that it should not be liable for Comdata's attorneys fees until such time as it is determined that Comdata is not liable to B–Right for return of improperly charged fees. B–Right continues to argue that it would be a rejection of the American rule if Comdata could collect even though B–Right may prevail on its underlying claim.

{¶ 47} As set forth in the first subassignment under the first assignment of error, there was no claim pending before the trial court regarding the alleged overbilling. In fact, B–Right only made its belated allegation of overcharge because certain sight drafts were not produced in discovery. These drafts were alleged to have been collected by the United States government in its Carino investigation. The relevant suit is the one filed by B–Right against Comdata on February 27, 2001, and amended in April 2001. All claims raised in that suit were disposed of by summary judgment in favor of Comdata. As such, there is no pending litigation which B–Right may win.

{¶ 48} The second issue raised by B–Right under this assignment deals with the fact that Comdata's answer and counterclaim are not reflected in the docket or in the file. B–Right argues that Comdata was barred from obtaining judgment for litigation expenses because it failed to raise the issue in its responsive pleading, noting that Civ.R. 5(D) requires that all papers after the complaint be filed with the court within three days of service. B–Right states

that this rule was not followed here because the docket shows no indication that an answer and counterclaim were filed. Thus, B–Right claims that the court's jurisdiction was never invoked on the counterclaim's request for indemnification for litigation expenses/attorneys fees.

{¶ 49} Although the docket may not reflect the filing of an answer and a counterclaim, B–Right's appellate brief at page one admits it was served with these documents on March 2, 2003. The docket shows that B–Right then filed a reply to Comdata's counterclaim. B–Right did not seek default judgment for failure to file an answer. Thereafter, Comdata filed a motion for summary judgment on its counterclaim, which relied on the plain language of the contract calling for indemnification for litigation expenses and attorney fees. B–Right then responded to this motion for summary judgment on the counterclaim. All the while, B–Right never raised this argument about the lacking docket entry until appeal. Contrary to their suggestions, this is not a jurisdictional issue, which can be raised at any time. Rather, this was a procedural technicality (which Comdata urges was an administrative error in the clerk's office). As such, the issue had to be raised below to avoid waiver of the issue on appeal.

{¶ 50} Regardless, we recently received a judgment entry from the trial court, which granted Comdata's motion to correct the record in accordance with App.R. 9. Thus, the answer and counterclaim are now part of the file and docket record with a file date of March 1. In accordance, this argument is overruled.

## ASSIGNMENT OF ERROR NUMBER THREE

{¶ 51} B–Right's third and final assignment of error alleges:

{¶ 52} "The trial court erred, to the prejudice of B–Right, when it ruled within its January 10, 2003 order, that Comdata proved the reasonableness of the claimed attorneys' fees."

{¶ 53} B–Right breaks this assignment of error into two subassignments. B–Right's second subassignment of error, which shall be addressed first, queries:

{¶ 54} "Did the trial court commit error, prejudicial to B–Right, when it failed to rule that the question of attorneys' fees is governed by Ohio law, which does not permit same if the promisee under the contract of indebtedness did not owe at least $100,000 at the time of execution?"

{¶ 55} Under this subassignment, B–Right claims that the choice-of-laws clause in the contract only applies to construction of the agreement, not enforcement. Thus, B–Right argues that Ohio law applies to the issue of whether the attorneys-fees clause is enforceable. B–Right then relies on R.C. 1301.21(C) to support its argument that the attorneys-fees clause was unenforceable under Ohio law.

{¶ 56} Pursuant to R.C. 1301.21(B) and (C), a contract of indebtedness can only contain an enforceable commitment to pay attorneys fees if the total amount owed on the contract of indebtedness at the time the contract was entered into exceeds $100,000. A contract of indebtedness is defined as a note, bond, mortgage, conditional sale contract, retail installment contract, lease, security agreement, or other written instrument of indebtedness, other than indebtedness incurred for purposes primarily personal, family, or household.

{¶ 57} Comdata states that even if Ohio law applied, R.C. 1301.21 is inapplicable because the agreement for Comdata's services is not a contract of indebtedness. Comdata cites a case from the Tenth Appellate District which held that a contract for delivery of produce against a line of credit is not a contract of indebtedness. *Roth Produce Co. v. Scartz* (Dec. 27, 2001), 10 Dist. No. 01AP–480, 2001 WL 1654555, citing *New Market Acquisitions, Ltd. v. Powerhouse Gym* (S.D.Ohio 2001), 154 F.Supp.2d 1213. Comdata concludes there was no indebtedness at the time B–Right signed the contract. Rather, Comdata agreed to provide its wire-transfer services to B–Right in the future in the form of a line of credit.

{¶ 58} Regardless, when Comdata sought summary judgment on its counterclaim for litigation expenses and attorneys fees, B–Right responded with the following one sentence: "As Comdata's Motion regarding B–Right's claims should be denied, there can be no claim for attorneys' fees." B–Right did not raise the unenforceability of the attorneys-fees clause or reasons in support at a time when the court was deciding whether Comdata should be granted summary judgment on its claim. The court then granted summary judgment to Comdata, holding that the clause was enforceable. The hearing on attorneys fees was to establish the amount, not to establish entitlement thereto. As such, by time of the attorneys-fees hearing, B–Right had already waived this issue. See, e.g., *State ex rel. BSW Group v. Dayton* (1998), 83 Ohio St.3d 338, 345, 699 N.E.2d 1271. This argument is thus overruled on the grounds of waiver.

{¶ 59} B–Right's first subassignment, which we chose to address last, asks: "Did the trial court commit error, prejudicial to B–Right, when it ruled that Comdata proved the fees it incurred were reasonable, necessary and customary for the work expended by its attorneys in defending the action below?"

{¶ 60} As B–Right's expert mentioned at trial, Tennessee and Ohio allow attorneys fees to be recovered according to the language of a contract. See, e.g., *Hosier v. Crye–Leike Commercial, Inc.* (July 17, 2001), Tenn.App. No. M2000–01182–COA–R3–CV, 2001 WL 799740; *Nottingdale Homeowners' Assn., Inc. v. Darby* (1987), 33 Ohio St.3d 32, 34, 37, 514 N.E.2d 702; *Goldfarb v. The Robb Report* (1995) 101 Ohio App.3d 134, 655 N.E.2d 211 (explaining the rationales for upholding the terms of the contract). In both states, the trial court

has discretion to determine what reasonable fees would be in a given case. *Albright v. Mercer* (Tenn.App.1996), 945 S.W.2d 749, 751; *Bittner v. Tri–County Toyota, Inc.* (1991), 58 Ohio St.3d 143, 569 N.E.2d 464. The party seeking the fees has the initial burden to prove that the fees requested are reasonable. *Beaty v. McGraw* (Tenn.App.1998), 15 S.W.3d 819, 831.

{¶ 61} Both states also use the same general standards for granting attorney fees and determining whether they are reasonable. These standards were originally taken from each state's Disciplinary Rules, specifically DR 2–106. *White v. McBride* (Tenn.1996), 937 S.W.2d 796, 800; *Bittner,* 58 Ohio St.3d at 145, 569 N.E.2d 464. The factors to be considered as guidelines in determining the reasonableness of a fee are as follows:

{¶ 62} the time and labor required, the novelty or difficulty of the question involved, and the skills required to perform the legal services properly;

{¶ 63} the attorney's inability to accept other cases;

{¶ 64} the fee customarily charged in the locality for similar services;

{¶ 65} the amount involved and the results obtained;

{¶ 66} the time limitations imposed by the client of the circumstances;

{¶ 67} the nature and length of the professional relationship with the client;

{¶ 68} the experience, reputation, and ability of the lawyer or lawyers; and

{¶ 69} whether the fee is fixed or contingent. Id.

{¶ 70} Thus, in a case such as this, the trial court starts out with the number of claimed hours multiplied by the desired hourly rate. *Bittner,* 58 Ohio St.3d at 145–146, 569 N.E.2d 464. The court then considers the factors relevant to that particular case and determines whether it wishes to deviate upwards or downwards. Id. If the court so deviates, it should state its reasons therefore in its entry so the reviewing courts can conduct a meaningful review. Id. The court is not to award attorneys fees in the claimed amount merely because that was the amount agreed upon between the party seeking fees and its attorneys. See *Galmish v. Cicchini* (2000), 90 Ohio St.3d 22, 35, 734 N.E.2d 782 (upholding deviation based on the factors even though the plaintiff had a contingent-fee agreement with his attorney). Here, the trial court apparently decided that the number of claimed hours times the desired hourly rate was reasonable and that none of the relevant factors warranted deviation from the claimed amount.

{¶ 71} In reviewing the award for an abuse of discretion, the appellate court is guided by the premise that the court must use its power of review to reverse if the amount of fees is so high or low as to shock the conscience. *Bittner,* 58 Ohio St.3d at 146, 569 N.E.2d 464. In doing so, we remain aware that

the trial court generally has a better opportunity to determine the value of the services in each case where it participated in the preliminary proceedings. Id.

{¶ 72} In conducting our review, we first assess the docket and corresponding filings and the attorney fees claimed to be reasonable by Comdata and its attorneys at the law firm of Thompson–Hine. Although Comdata was mentioned in B–Right's May 2000 complaint against the truck stops, B–Right forgot or otherwise failed to name Comdata as a defendant. So, Comdata was not added as a defendant until February 27, 2001. A second amended complaint was then filed in April 2001, but this did not add anything of substance that required more than cursory review. Comdata filed a motion to dismiss in April 2001 and supplemented it with four pages three weeks later. B–Right opposed this motion, and Comdata filed a reply. Notably, Comdata's motion was not successful.

{¶ 73} A pretrial was held in February 2002. Comdata filed their answer and counterclaim in March 2002. Comdata then filed two motions for summary judgment on April 24, 2002. B–Right opposed these motions three weeks later. Finally, Comdata filed a reply in further support, culminating in the trial court's grant of the summary judgment motions on May 28, 2002.

{¶ 74} Miscellaneous motions were filed by both parties throughout, such as motions for discovery and Comdata's objections to discovery and subsequent motion for reconsideration of the denial of its objections. Motions were filed between B–Right and the other defendants, which although they did not directly concern Comdata, they would have been reviewed by Comdata. It is also noteworthy that some of the other defendants' arguments were adopted by Comdata, which could have meant less work for the Comdata attorneys.

{¶ 75} The exhibits identified at the hearing on attorneys fees establish the claimed amount of fees through monthly invoices sent by Thompson–Hine and checks paid by Comdata. The monthly invoices showed the individual who performed the work, their time spent each day, their hourly rate, and a total of all hours for all individuals for the month. The invoices originally contained a description of the work done at each work period by each individual; however, the invoices were redacted, as Comdata and their attorneys claimed that the description of the work performed was privileged.

{¶ 76} The expenses incurred by the firm allegedly totaled $4,935.78. We note that this amount for expenses is not disputed in B–Right's appellate brief. As such, we shall not review the award for expenses. The total time spent on the case between March 2001 and September 2002 is claimed to be 524.75 hours. The fees totaled $128,113.75 for the above-stated time period, for a total request and award of $133,049.53.

{¶ 77} More specifically, the invoices establish six categories of individuals on the case. One partner billed at $465 per hour; however, he only billed for 1.25 hours. The second partner, attorney Zych, billed at $365 per hour for 42.4 hours and $375 per hour for 125.75 hours; it seems he raised his rates at the beginning of the new year. An associate, attorney Movius, billed at $190 per hour for 288.5 hours. Another associate billed at $150 per hour for 61 hours. A legal assistant billed at $165 per hour for 4.75 hours, and another legal assistant billed at $115 per hour for 1 hour.

{¶ 78} We shall now turn to the testimony presented at the hearing on attorney fees. Comdata called one witness, attorney Christine Laird, Comdata's in-house counsel. She stated that in large litigation cases such as this, Comdata contracts the work out to law firms. She noted that Comdata chose Thompson–Hine due to a prior relationship. She also testified that she has been with Comdata for just over a year as associate counsel. Thus, she was not present for the first seven or eight months of litigation.

{¶ 79} Laird claimed to be familiar with the Comdata litigation from her start at Comdata. Some of her duties included reviewing the file and the filings, talking to the Thompson–Hine attorneys on the status of the case, and keeping up with correspondence. She identified the monthly invoices received from the firm, which B–Right paid in full, and she testified that she had reviewed these invoices to ensure the tasks had been performed and the work was appropriate. Finally, Laird opined that the rates charged by Thompson–Hine were not objectionable or excessive. She stated that the rates were in line with Comdata's experience in other litigation, naming various states where Comdata has pending litigation.

{¶ 80} On cross-examination, she admitted that Thompson–Hine did not have to attend depositions because they were added as defendants after ten months of discovery had occurred. She also conceded that Comdata's motion to dismiss and motion for reconsideration of a denial of their objection to discovery were denied and their motion for summary judgment was not filed until over a year after they were named as a defendant.

{¶ 81} Then, B–Right called its expert witness on attorneys fees, attorney Daniel McGown, whose practice is restricted to business-related civil litigation, and who has taught continuing-legal-education courses in UCC application among other things. He testified that he spent six hours reviewing the files and the docket and the billing records of both Thompson–Hine and McNamara and Freeman, the firm that represented B–Right. He noted that B–Right's attorneys fees only totaled $26,276 for the entire lawsuit, which included work against other defendants which predated Comdata's involvement by one year, whereas Comda-

ta only had to defend against B–Right without much regard for the other defendants.

{¶ 82} He opined that the total requested fees were clearly excessive based upon the factors listed above. He alleged that the partner rates were especially excessive and seemingly unnecessary. As for the partner who charged $365/375 per hour, McGown claimed that nothing in the case required a specialty attorney at that rate. He decided that the case could have been handled competently by an attorney at a rate of between $150 and $200 per hour. McGown also specified that the number of hours was excessive. He noted that with the redacted bills, he could not tell if each hour on each day was justified and could not determine if the various individuals at the firm were billing for the same time. He also pointed out that the dispute only involved transactions totaling around $150,000 and the attorneys fees were thus almost as much as the amount involved. Finally, he concluded that Comdata's attorneys fees should not have been more than $15,000.

{¶ 83} We must now use our powers of review and apply the factors to the case at hand to determine whether the actual fees charged by Thompson–Hine and paid by Comdata were reasonable as an award against B–Right. First, we note that Comdata was granted summary judgment, so there was no trial, and its attorneys did not have to attend depositions. We also note that according to the trial court, Comdata relied on many of the grounds raised in another defendant's summary judgment motion. On the other hand, the issues were not necessarily easy ones considering B–Right's fluctuating positions and amendments. Moreover, the UCC is not always the clearest of legal subjects. Yet, we have no indication that the $365/375 per hour partner had the relevant skills needed over those of the $190 per hour associate, who worked on the case 100 more hours than the partner. See DR 2–106(B)(1).

{¶ 84} As for the next factor, although attorneys Movius and Zych had three fairly busy months on the case, the remaining months were not so busy and there is no evidence that any of the lawyers was precluded from other employment as a result of the retainer in this case. DR 2–106(B)(2).

{¶ 85} We move to the third factor. According to B–Right's expert, the $190 hourly fee charged by Movius and the $150 hourly fee charged by the other associate are considered customary and reasonable. Therefore, there are no issues concerning these hourly rates.

{¶ 86} However, B–Right's expert did take issue with the $365/375 per hour fee charged by Zych. The $465 fee was not specifically mentioned since this partner only spent about an hour on the case, but it was obviously considered excessive by the B–Right expert. Comdata's in-house counsel opined that all

hourly fees were appropriate compared to her experience with hiring outside counsel in other cases. However, she named litigation in places such as Baton Rouge, San Antonio, Delaware, and Florida. The Delaware suit involved a bankruptcy. The subject matter of the other suits was not mentioned. This is not evidence of the "fee customarily charged in the locality for similar legal services." DR 2–106(B)(3).

{¶ 87} We note that the Supreme Court once lowered a requested fee to $100 per hour in Montgomery/Franklin County where the issue was uncomplicated, and we ask whether the Supreme Court contemplated that an averagely complicated (but not extremely complicated) issue could generate rates over 3.5 and 4.5 times that amount in Mahoning County, Ohio. *In re Brigner* (2000), 89 Ohio St.3d 1460, 732 N.E.2d 994.

{¶ 88} We cannot overlook the fees granted for two legal assistants. It is not immediately apparent why a legal assistant bills $165 per hour while an associate attorney bills $150 per hour. The record before us does not divulge that these persons are lawyers or even paraprofessionals, and this is a claim for attorneys fees. From our review of the record, legal assistant could mean secretary. If these persons were paralegals or law clerks to the firm or Comdata, then they had the burden to state this on the record. The fees for secretarial staff are typically considered a cost of doing business and are implicit in the hourly rate charged by an attorney. Moreover, both the $165 and the $115 per hour fees are unreasonable for secretaries (or paralegals) in this locality. Additionally, there is no indication what these individuals contributed.

{¶ 89} Moving to the next factor, we point out that the amount involved here turned out to be $156,837.68, which was the amount of judgment entered against Carino. B–Right's original complaint listed the amount at $188,499. In this original complaint, B–Right also sought $750,000 in punitive damages, attorneys fees, and costs. Although parties are not to place such large specific monetary amounts in the complaint and although B–Right later amended the complaint to delete such amounts, the fact of the matter is that Comdata was put on notice that B–Right was seeking a substantial sum in punitive damages. Thus, the court is not constrained to viewing only the final amount of disputed transactions, $156,837.68, when deciding if it was unreasonable to spend almost that same amount in attorneys fees. DR 2–106(B)(4).

{¶ 90} As for time limitations, there is no indication that the client or the circumstances made Thompson–Hine pressed for time in this case. They did not file the motion for summary judgment until over a year after Comdata was sued, which may not seem long until one remembers that the case proceeded with discovery for almost a year before that. DR 2–106(B)(5).

{¶ 91} There is testimony that Comdata had a prior professional relationship with Thompson–Hine. It is thus implicit that Comdata was satisfied with the firm's work history. The length of that prior relationship was not mentioned. DR 2–106(B)(6).

{¶ 92} As for experience, reputation, and ability of the lawyers involved, this factor ties in with (B)(6) above. On cross-examination, B–Right's expert admitted that the Thompson–Hine attorneys he encountered in bankruptcy court seemed competent. However, this is unrelated to the quality of these specific lawyers in the firm. DR 2–106(B)(7).

{¶ 93} Finally, the fee was fixed rather than contingent, and as discussed supra, the final amount came to $128,113.75. This is a good place to reiterate that B–Right was only charged $26,276 by its attorneys and their litigation began almost a year earlier and involved more opposing parties. DR 2–106(B)(8).

{¶ 94} This leaves us with the following issues:

{¶ 95} Did the court abuse its discretion in retaining the 524.75 total hours of work claimed by the firm?

{¶ 96} Did the court abuse its discretion in retaining the $465 and $365/375 hourly fees charged by the two partners? and

{¶ 97} Did the court abuse its discretion in retaining the $165 and $115 hourly rates for two legal assistants?

{¶ 98} As for the first issue, Thompson–Hine claims to have spent 524.75 hours on this case from March 2001 until September 2002. B–Right's expert states that the number of hours seems excessive. In taking his final estimate of reasonable fees divided by the hourly rate he opined was reasonable, we see that B–Right's expert feels the total hours should have only been approximately 75 hours. This is an extreme discrepancy in the total number of hours reasonably needed to litigate the pretrial stages of the case. Seventy-five hours seems unreasonably low; yet, 524.75 hours seems unreasonably high.

{¶ 99} Although at first glance one may believe this is more of a credibility issue since Comdata's in-house counsel agreed with the time spent by the Thompson–Hine attorneys and B–Right's expert thought it clearly excessive, we cannot say that the trial court was in the best position to determine whether the number of hours claimed by Thompson–Hine were reasonable under the facts and circumstances of this case because the paperwork which served as the whole basis for the award was redacted. These descriptions of work performed by each actor during each time period of each day should not have been redacted. Comdata's overly broad redactions based on an alleged attorney-client privilege only serve to require this court to reverse and remand for a new hearing

concerning the number of hours that could have reasonably been spent in this case. We do note, however, that on remand, some redactions may still be appropriate. If for example, the description stated, "phone call regarding client's wish to settle," a redaction to protect the attorney-client privilege could have been made at the word "regarding."

{¶ 100} We have also concluded that the second and third issues must be reversed. However, we are not remanding on these issues. This court has determined that certain hourly fees shock their conscience. This court is not bound by the opinion of experts as to the value of services; nor is the court bound by the action of the lower court when the fees allowed are excessive or inequitable. See, e.g., *Connors v. Connors* (Tenn.1980), 594 S.W.2d 672, 677 (reducing the $25,000 fee to $12,500 without remanding). Once again, the redacted descriptions in the invoices may have harmed Comdata's case as they could have bolstered the inference that the partner fees were necessary and reasonable. Comdata did not meet their burden to prove that the $465 and $365/375 hourly partner rates were reasonable under the facts and circumstances of this case. There was absolutely no evidence that these fees were comparable to *similar cases for this locality.* A fee is not justified merely because it was paid by the client. A client cannot choose the most expensive firm in a different locality and expect to recover full fees from their opponent in another locality just because they have proof that they paid the bill. We thus reverse the award with regard to the amounts charged by the partners without remanding.

{¶ 101} As aforementioned, there was also no evidence as to the work performed by the legal assistants, what a legal assistant is to the firm, or how $165 or $115 is reasonable in this locality. Most importantly, there is no indication why these fees are not a cost of doing business necessarily included in the regular attorneys' rates. Thus, these fees are to be deleted.

{¶ 102} The insufficiency in proving the partners' hourly rate or the reason behind fees for a legal assistant does not require rehearing by the trial court. See, e.g., *Connors,* 594 S.W.2d at 677 (where the Tennessee Supreme Court reduced a $25,000 fee to $12,500 without remanding). Although we are forced to remand for a new hearing on the amount of hours allowed, we shall not remand for a new hearing on hourly rates. Since Comdata failed to meet its burden on hourly rates and legal assistants, we refuse to remand to give them another chance. In doing so, we are not substituting our judgment for that of the trial court. Rather, we are ordering the trial court to apply undisputed hourly rates to whatever hours are approved by the trial court on remand.

{¶ 103} As such, all partner fees are to be reduced to $190, which is the fee charged by the main attorney on the case and which was conceded to be

reasonable by B–Right. As previously noted, there is no dispute as to the two associates' hourly rates. Thus, the trial court is still to use $190 for the main associate and $150 for the secondary associate. Lastly, the trial court is to disregard the 5.75 claimed hours for the legal assistants.

{¶ 104} For the foregoing reasons, the grant of summary in favor of Comdata on B–Right's claim is affirmed, the grant of summary judgment in favor of Comdata on its counterclaim is affirmed, but the amount of attorneys fees awarded is reversed in part and the cause remanded. A new hearing shall be conducted on whether the amount of hours claimed to be spent by Comdata's attorneys is reasonable.

Judgment affirmed in part,
reversed in part
and cause remanded.

WAITE, P.J., and DEGENARO, J., concur.