Judgment reversed<br>and cause remanded.

BROGAN and FROELICH, JJ., concur.

The STATE ex rel. CORDRAY, Atty. Gen.,

v.

ESTATE OF ROBERTS et al., Appellants;

Citizens National Bank of Norwalk et al., Appellees.

[Cite as *State ex rel. Cordray v. Estate of Roberts*,
188 Ohio App.3d 306, 2010-Ohio-2003.]

Court of Appeals of Ohio,
Sixth District, Erie County.

No. E–09–042.

Decided May 7, 2010.

Kevin J. Zeiher, for appellants.

Michael S. Scalzo, Amy M. Natyshak, and Jill K. Bigler, for appellees.

---

HANDWORK, Judge.

{¶ 1} This case is before the court on appeal from the judgment of the Erie County Court of Common Pleas, granting the motion for summary judgment filed by Citizens National Bank of Norwalk and Citizens Banking Company (collectively, "Citizens"), with respect to the third-party complaint filed against Citizens by James L. Roberts, Thomas J. Roberts, and Ultimate Industries, Inc. (collectively, "appellants"). Appellants raise the following assignments of error on appeal:

{¶ 2} Assignment of Error No. 1:

{¶ 3} "Did the trial court commit reversible error when it granted the motion for summary judgment filed with third-party defendant Citizens Banking Company when it failed to recognize significant questions of fact?"

{¶ 4} Assignment of Error No. 2:

{¶ 5} "Did the trial court commit reversible error when it granted the motion for summary judgment filed by third-party defendant Citizens Banking Company and found as a matter of law that third-party defendant had acted in a commercially reasonable manner in dealing with third-party plaintiff's real property during foreclosure?"

{¶ 6} This action arose as a result of environmental violations at real property located in Sandusky, Ohio. The property was owned and operated by appellants, who manufactured artificial rocks and rock waterfalls at the property. The manufacturing process involved the use of chemicals, paint, and stain and generated hazardous and nonhazardous waste. In 2002, the Ohio Environmental Protection Agency ("OEPA") cited Ultimate Industries, Inc. ("Ultimate") for improperly venting paint booths and storing waste on the property in 55–gallon drums. Ultimate was ordered to remove 20 drums of waste, eight of which contained hazardous waste. Ultimate complied by April 2, 2003.

{¶ 7} During the life of the business, beginning in 1993, Ultimate borrowed funds from Citizens in exchange for a security interest in Ultimate's various assets. On September 7, 2000, Citizens obtained an open-ended mortgage on the property. In 2003, Ultimate's business began to fail and eventually ceased operations on June 30, 2004. Thomas Roberts testified that Citizens received the

key to the property in October or November 2004. Appellants never removed the 55–gallon drums from the property, some of which contained hazardous waste at the time the business closed.

{¶ 8} Thomas testified that he and his father, James Roberts, attempted to get buyers for the building, the office equipment, the manufacturing machines, and paint sprayers, and the chemicals that were not waste. According to Thomas, at the time the business closed, approximately 90 percent of the 55–gallon drums on the premises were filled with chemicals, paint, and stain that were viable, marketable, and usable.[1] Although there were a number of 55–gallon drums filled with usable product, only one or two were sold by Citizens.

{¶ 9} In a separate action, on May 20, 2005, Citizens instituted a foreclosure action against the property. Appellants assert that at all times since they defaulted on the mortgage, Citizens had control of the property. During that time, Citizens sold some of the items it held as security for loans made to appellants, including one or two drums of chemicals, paint sprayers, molds, and intellectual property. However, an alleged offer to purchase the entire building and its contents for $100,000, made by an outside party in late 2005, was not accepted by Citizens. According to Thomas, during this time frame, Citizens was warned about the building's deterioration, specifically, that a lack of heat would cause the pipes to burst and that there was a hole in the roof through which a sprayer, sold by Citizens, had been removed, thereby allowing water to collect on the third floor. Except for putting antifreeze in the toilets, Thomas testified that Citizens took no action to protect the building, and black mold took over the structure.

{¶ 10} On May 16, 2006, the property was sold at sheriff's sale to Citizens for $40,000. A confirmation of sale was filed on July 11, 2006, and the sheriff was ordered to convey the deed to Citizens. In September 2006, Citizens moved to have the July 11, 2006 confirmation of sale vacated, due to "newly discovered evidence." Although the motion was apparently contested, on January 22, 2007, without conducting a hearing, the trial court granted Citizens' motion to vacate "based on newly discovered evidence and the fact that no prejudice to any party results from such a finding." In granting Citizens' motion to vacate the sheriff's sale, the trial court held the following: "[Citizens] acted within a reasonable time of becoming aware of the newly discovered evidence which by due diligence could not have been discovered in time to cancel the sale. Despite [Ultimate's] argument, this Court finds that the property and the rights to access the

---

1. Based upon a 2007 inventory conducted by the OEPA, it appears that there were 54 drums on the property. Ten were empty and Thomas concedes that nine were filled with waste, leaving approximately 35 drums that, according to Thomas, were filled with marketable product in 2004.

property prior to sale had at all times belonged to [Ultimate], and [Citizens] was never legally entitled to the inspection [Ultimate] claims. The Deed to the property is, and always has been, in the name of [Ultimate and the Roberts] (before and after the sale)."

{¶ 11} With respect to this action, while Citizens' motion to vacate the sheriff's sale was pending, on October 6, 2006, upon the request of the Director of Environmental Protection, the Attorney General ("the state") filed a complaint for injunctive relief and civil penalties against appellants to enforce Ohio's air-pollution control, pursuant to R.C. Chapters 3704 and 3751 and administrative rules promulgated thereunder, for alleged air-pollution violations that occurred between 1994 and 2003. On May 8, 2007, accompanied by Thomas Roberts, OEPA inspected the property and found additional violations of hazardous-waste laws, primarily storage of hazardous waste in excess of 180 days.[2]

{¶ 12} Out of the 54 total number of 55–gallon drums on the premises, only 44 were filled. Eight of these 55–gallon drums were determined to contain hazardous waste by OEPA, but not all the drums were tested. In a letter dated July 13, 2007, Ultimate was ordered to immediately evaluate the waste and properly dispose of all hazardous waste within 15 days. Due to a financial inability, Ultimate did not remove the hazardous waste.

{¶ 13} James L. Roberts died on July 24, 2007, and a suggestion of death was filed on December 6, 2007. Ultimate's articles of incorporation were cancelled by the Ohio Secretary of State's Office on July 26, 2007. On January 25, 2008, the state filed an amended complaint, substituting the estate of James L. Roberts[3] in place of James L. Roberts, the individual, and alleging additional hazardous-waste claims. On April 30, 2008, appellants were granted leave to file a third-party complaint against Citizens.[4]

{¶ 14} In their third-party complaint, appellants asserted in their first cause of action that Citizens breached its duty of good faith and fair dealing involving the real property and secured items. Specifically, appellants asserted that Citizens was guilty of waste for failing to take steps to adequately protect the real property and its contents during the pendency of the foreclosure action. Appel-

---

2. Although the contents of a number of drums were still marketable in 2004, by 2007 most of the drums' contents were no longer usable and had turned to waste and/or hazardous waste. Additionally, because drums were rusting as a result of the hole in the roof, those drums were at risk of leaking.

3. No estate was ever opened for James L. Roberts, and because no such entity existed, the state's claims against the "estate of James L. Roberts" were eventually denied and dismissed.

4. The third-party complaint was brought by appellants, James L. Roberts, Thomas J. Roberts, and Ultimate Industries, Inc., and not in the name of an estate.

lants claimed that Citizens caused them damage by not accepting the offer to purchase that was presented by an outside party. Appellants also asserted damages arising out of Citizens' rescission of the sheriff's sale.

{¶ 15} Appellants asserted a breach-of-contract claim in their second cause of action against Citizens. Specifically, appellants contend that because Citizens had a security interest in the real property and its contents and inventory and had control of the property since June 2004, Citizens was responsible for some of the alleged violations in the state's amended complaint.[5] Appellants also asserted that any of the contents in the premises, including any hazardous waste, were no longer owned by, possessed by, or in the control of appellants.

{¶ 16} The state filed a motion for partial summary judgment on the basis of liability only. On December 19, 2008, Citizens filed a motion for summary judgment arguing that the claim of breach of duty of good faith and fair dealing could not stand alone because it was part of a contract claim and, thus, was subsumed by the claim of breach of contract. Citizens also argued that it did not breach its contract and that appellants failed to point to any provision, in either the financing statement or continuation statement, that placed an obligation on Citizens with respect to OEPA's claims against appellants.

{¶ 17} In its March 11, 2009 judgment entry,[6] the trial court held Thomas Roberts and Ultimate liable to the state, but found no liability with respect to the estate of James L. Roberts, since no estate was ever opened in his behalf.[7] With respect to Citizens' motion for summary judgment, the trial court held that "[b]ecause a contractual relationship carries with it an obligation to act in good faith and with fair dealing, a Breach of Contract claim subsumes any accompanying claim for Breach of the Duty of Good Faith and Fair Dealing."

{¶ 18} With respect to appellants' breach-of-contract claim, the trial court held that in order for there to be a breach, there must be a failure, without legal excuse, to perform a contractual duty. In reviewing the parties' contract,

---

5. The state's amended complaint stated that appellants had failed to obtain permits to install equipment, failed to obtain permits to operate equipment, failed to submit a complete Title V Permit application, operated a Title V source without a Title V Permit, failed to submit a Title V Fee Emission Report, failed to submit Title V Emission Fees, failed to maintain appropriate records, failed to release toxic-release inventory reports and fees, failed to evaluate waste, failed to label and date hazardous-waste containers, failed to maintain a sufficient aisle space, failed to post emergency information, failed to give notice of cessation of regulated operations, failed to have a closure plan and close the facility, and failed to remove hazardous waste in accordance with an approved closure plan, which resulted in claimed damages in excess of $25,000 per day and $10,000 per day for other violations, including the cleanup.

6. The judgment entry was journalized on April 10, 2009.

7. The state dismissed the estate of James L. Roberts on April 28, 2009.

specifically, the Open End Mortgage, the trial court found that there was no contractual duty for Citizens to remediate, respond, or clean up hazardous waste at the premises and, in fact, found that the contract specified that the duty was upon appellants. Moreover, the trial court found that although Citizens had discretion under the contract to perform any duty or covenant that appellants failed to perform, there was no obligation for Citizens to do so. The trial court also noted that no appeal was taken from the foreclosure action, and "[w]hile there may be some liability of a financial institution under environmental statutes for remediation, that theory of recovery was never pled. Moreover, another court has specifically found that the property was never titled in Citizens' name. So the responsibility for environmental remediation, which generally accompanies ownership under some environmental legislation, does not apply here." Thus, the trial court granted summary judgment in Citizens' favor and dismissed the third-party complaint filed by appellants.

{¶ 19} A bench trial was held on April 28, 2009, to determine the civil penalty to be imposed. In a judgment entry dated June 25, 2009,[8] the trial court ordered injunctive relief, which required Ultimate and Thomas Roberts to evaluate and label all waste present, remove all hazardous waste, secure the property, and submit a closure plan acceptable to OEPA. The trial court assessed a civil penalty of $50,000; however, it held $47,500 of the penalty in abeyance on the condition that Ultimate and Thomas Roberts fully complied with the required injunctive relief within 120 days of the trial court's order. Following this final judgment, appellants appealed the trial court's grant of summary judgment in favor of Citizens.

{¶ 20} In reviewing a motion for summary judgment, an appellate court must apply the same standard of law as the trial court. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198. Thus, summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). This appellate review is de novo, *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, and requires the court to independently examine the evidence to determine, without deference to the trial court's determination, if summary judgment is warranted. *Brewer v. Cleveland City Schools* (1997), 122 Ohio App.3d 378, 383, 701 N.E.2d 1023, citing *Brown v. Scioto Cty. Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153.

---

8. The trial court's judgment entry was journalized on August 7, 2009.

{¶ 21} As appellants' assignments of error both concern the trial court's grant of summary judgment on behalf of Citizens, we will consider these assignments of error together. Appellants argue that genuine issues of material fact exist that precluded the trial court from granting Citizens' motion for summary judgment. Specifically, appellants assert that Citizens has a security interest in all inventory, accounts, government payments, instruments, documents, chattel paper, equipment, and general intangibles, as evidenced by the financing statement, dated December 3, 1997, and a continuation financing statement, dated October 4, 2007. Because of Citizens' security interest, appellants argue that Citizens had a duty, pursuant to R.C. 1309.610, to dispose of the secured collateral in a commercially reasonable manner.

{¶ 22} Appellants assert that 90 percent of the 55–gallon drums contained usable chemicals at the time Ultimate went out of business and that Citizens and its employees, including Doug Gates, knew this. Thus, appellants argue that a genuine issue of material fact exists with respect to whether Citizens breached the security agreement when it turned down offers to purchase the premises and its contents, including the usable chemicals, and, instead, allowed usable chemicals to sit for years, during which time the chemicals turned into hazardous waste. Appellants assert that they were damaged by Citizens' breach because, once the drums turned into hazardous waste, appellants became the parties responsible for the environmental cleanup.

{¶ 23} Citizens responds that there can be no separate cause of action for breach of the covenant of good faith independent of the underlying breach-of-contract claim. Citizens also asserts that the party asserting a breach of contract must demonstrate that a contract existed, that one party fulfilled its obligations, but the other party failed to, and that damages resulted from that failure. According to Citizens, appellants failed to point to any particular contract or contractual provision that Citizens allegedly breached. Citizens argues that R.C. 1309.610 cannot serve as a basis for appellants' breach-of-contract claim because (1) Citizens did not violate R.C. 1309.610, (2) R.C. 1309.610 creates a statutory duty, not a contractual duty, and must be pleaded as a statutory claim, which appellants failed to do, (3) while appellants allege a breach of contract with respect to Citizens' disposition of both the building and its contents, R.C. 1309.610 does not apply to actions involving real property or real property mortgages, (4) Citizens never had possession of the property, as evidenced by the trial court's decision vacating Citizens' purchase of the property, (5) R.C. 1309.610 is a permissive statute and, therefore, Citizens is not required to dispose of appellants' collateral, but may do so upon its own discretion, and (6) the collateral that Citizens decided to take control of was disposed of in a commercially reasonable manner.

{¶ 24} Citizens additionally argues that appellants attached only the financing statement and the continuation statement to its third-party complaint, but failed to attach the mortgage, as required, and that, in any event, appellants failed to point to any provision in either the financing statement or continuation statement that places an obligation on Citizens with respect to the OEPA's claims against appellants. According to Citizens, both the financing statement and the continuation statement are clear and unambiguous with respect to the rights and obligations of the parties and create a security interest in appellants' personal property, but do not place any obligation on Citizens with respect to the OEPA's claims or with respect to any other allegations made by appellants. Even if this court finds that appellants established that Citizens failed to meet its obligations under the security agreement, Citizens argues that appellants failed to prove that they fulfilled their obligations, as required for a breach-of-contract claim. Finally, Citizens argues that appellants cannot establish that Citizens breached any contractual duty under the mortgage agreement.

{¶ 25} Upon a thorough review of the record and consideration of applicable law, we find that genuine issues of material fact exist that prevent the granting of summary judgment in favor of Citizens. The facts are undisputed that in exchange for loans and financing, appellants agreed to and entered into a mortgage that secured the real estate in question and gave Citizens a security interest in all inventory, accounts, government payments, instruments, documents, chattel paper, equipment, and general intangibles. The security interest held by Citizens was a binding contract. Citizens, however, argues that we cannot rely on the terms of the mortgage because appellants failed to attach a copy to the third-party complaint. Nevertheless, we find that because Citizens attached a copy of the mortgage to its motion for summary judgment and relied on it, we will consider the terms of the mortgage agreement as it was before the trial court.

{¶ 26} At the time appellants defaulted on their agreement to repay the loans, there allegedly existed approximately nine drums of hazardous waste, of which appellants failed to dispose. The mortgage agreement specifically states that appellants are responsible for taking "all necessary remedial action in accordance with any Environmental Law." Although Citizens may perform appellants' responsibilities under the mortgage agreement, it is not required to do so. Notwithstanding that fact, we find that the question in this case concerns Citizens' disposition of the inventory in which it held a security interest, specifically, the 55–gallon drums that allegedly contained viable, marketable, and usable chemicals at the time appellants defaulted on their agreement.

{¶ 27} In this case, Citizens argues that it never had possession of the inventory, as evidenced by the judgment entry of the Erie County Court of

Common Pleas, *Citizens Banking Co. v. Ultimate Industries, Inc.* (Jan. 22, 2007), Erie C.P. No. 2005–CV–336, in which, when vacating Citizens' purchase of the real estate in this case, the court held that "the property and the rights to access the property prior to sale had at all times belonged to [appellants], and [Citizens] was never legally entitled to the inspection [appellants claim]." This court questions the correctness of this finding because the mortgage agreement specifically states that Citizens or its agents "may, at [Citizens'] option, enter the Property at any reasonable time for the purpose of inspecting the Property." Unfortunately, the foreclosure action is not before this court, and we will not disturb the finality of that judgment.

{¶ 28} Nevertheless, we find that genuine issues of material fact exist in this case with respect to whether Citizens had possession of or access to the inventory in question and whether it exercised its rights upon appellants' default in accordance with Ohio law. Specifically, Thomas Roberts testified that Ultimate had stopped making mortgage payments prior to the business's closure in June 2004. Thereafter, according to Roberts, he provided Citizens the keys to the property and brought potential buyers of the real property, and its contents, to Citizens.

{¶ 29} The mortgage sets forth when a "default" occurs, and what Citizens' available remedies are upon default, as follows:

{¶ 30} "13. DEFAULT. Mortgagor will be in default if any party obligated on the Secured Debt fails to make payment when due. Mortgagor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

{¶ 31} "14. REMEDIES ON DEFAULT. In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default.

{¶ 32} "At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the

Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again."

{¶ 33} Appellants were clearly in default of the mortgage by June 30, 2004, if not earlier. Although Citizens did not sell the real property and its contents to alleged potential buyers, there is testimony that Citizens sold one or two drums of chemicals and equipment used in the manufacturing process, including machinery and molds. Citizens also sold intellectual property, such as appellants' patent on its manufacturing process.

{¶ 34} According to the mortgage, "[t]his Security Instrument is governed by the laws of the jurisdiction in which [Citizens] is located * * *." Pursuant to R.C. 1309.601(A) and (D), after default, a secured party, such as Citizens, and a debtor or obligor, such as appellants, have the rights provided in R.C. 1309.601 to 1309.628. R.C. 1309.610 sets forth Citizens' responsibilities with respect to disposition of the secured collateral after appellants' default. R.C. 1309.610 states:

{¶ 35} "(A) After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.

{¶ 36} "(B) Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, at any time and place, and on any terms."

{¶ 37} Citizens argues that R.C. 1309.610 is permissive and not mandatory and, therefore, it was not required to dispose of the collateral. We, however, find that because Citizens' agent, Doug Gates, was allegedly present at the property to sell some of the inventory and equipment, genuine issues of material fact exist with respect to the following: (1) whether Citizens had possession of all the inventory, not just the inventory it sold, (2) whether Citizens knew that there were drums of marketable chemicals within the premises, and (3) whether Citizens breached the terms of the security agreement by failing to dispose of the chemicals in a timely fashion and in a commercially reasonable manner, pursuant to R.C. 1309.610, when it allowed allegedly viable, marketable, and useable chemicals to sit for such an extended period of time that they turned into hazardous waste.

{¶ 38} We further find that a genuine issue of material fact exists with respect to whether Citizens breached its duty of good faith and fair dealing, which is implied in the performance of any contract,[9] when it allegedly had possession of inventory, in which it had a security interest, but allowed the inventory to deteriorate into hazardous waste, and allegedly caused appellants additional damages in excess of their mortgage obligation to Citizens. See R.C. 1309.625.

{¶ 39} Additionally, we find that Citizens' argument that it was not required to properly dispose of inventory, which it allegedly possessed, because appellants defaulted on their mortgage agreement is disingenuous. Obviously, if appellants never defaulted on the mortgage, Citizens would never have acquired the right to dispose of appellants' inventory. However, once it acquired such a right and acted upon it, we find that Citizens was required to act in accordance with R.C. Chapter 1309.

{¶ 40} Based on the foregoing, we find that the trial court erred in granting summary judgment. Genuine issues of material fact exist that preclude the granting of summary judgment, and reasonable minds cannot conclude that Citizens is entitled to judgment as a matter of law. Accordingly, we find appellants' first and second assignments of error well taken.

{¶ 41} On consideration whereof, this court finds that substantial justice has not been done the party complaining, and the judgment of the Erie County Court of Common Pleas, granting Citizens' motion for summary judgment, is reversed. This matter is remanded to the trial court for further proceedings in accordance with this decision and judgment entry. Appellees are ordered to pay the costs of this appeal pursuant to App.R. 24.

*Judgment reversed*
*and cause remanded.*

OSOWIK, P.J., and PIETRYKOWSKI, J., concur.

---

9. See *B–Right Trucking Co. v. Interstate Plaza Consulting,* 154 Ohio App.3d 545, 2003-Ohio-5156, 798 N.E.2d 29, ¶ 32.