[Cite as *Home S. & L. Co. of Youngstown v. Evergreen Land Dev.*, 2016-Ohio-1248.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| HOME SAVINGS AND LOAN COMPANY OF YOUNGSTOWN | ) | |
| | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | CASE NO. 12 MA 215 |
| V. | ) | |
| | ) | OPINION |
| EVERGREEN LAND DEVELOPMENT, et al. | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 08 CV 2876

JUDGMENT: Affirmed in part. Reversed in part and modified.

APPEARANCES:

For Plaintiff-Appellee
Attorney Douglas DiPalma
Attorney Komlavi Atsou
Cavitch, Familo & Durkin Co., LPA
1300 East Ninth Street, Twentieth Floor
Cleveland, Ohio 44114

For Defendants-Appellants
Attorney David Detec
Manchester Newman & Bennett, LPA
Atrium Level Two
The Commerce Building
201 East Commerce Street
Youngstown, Ohio 44503

JUDGES:

Hon. Mary DeGenaro
Hon. Frank D. Celebrezze, Jr.
    Judge of the Eighth District Court of
    Appeals, sitting by assignment
Hon. Kathleen Ann Keough
    Judge of the Eighth District Court of
    Appeals, sitting by assignment

Dated: March 24, 2016

DeGENARO, J.

{¶1} Defendants-Appellants, Evergreen Land Development and Alfonso Valdes appeal the judgment of the Mahoning County Court of Common Pleas in favor of Appellee, Home Savings and Loan Company of Youngstown. On appeal, Evergreen and Valdes assert that the trial court made multiple errors regarding discovery: Evergreen's and Valdes' separate defenses and counterclaims, specifically the timeliness of Valdes' asserted status as an accommodation maker and both appellant's claims of promissory estoppel and negligent misrepresentation; the amount of judgment and damages; and finally the award of attorney fees against Evergreen and their assigned priority. Defendant-Appellant Thomas Zebrasky filed a separate appeal asserting the same accommodation argument raised by Evergreen and Valdes. For the reasoning below, all of Evergreen, Valdes and Zebrasky's arguments are meritless, except for the amount of attorney's fees and costs awarded to Home Savings against Evergreen. Accordingly, the judgment of the trial court is affirmed in part, reversed in part and modified. The judgment entered in favor of Home Savings against Evergreen for reasonable attorney fees and costs of $378,938.02 is reduced by $3,146.60 and modified to $375,791.42.

## Factual History

{¶2} Valdes and Zebrasky had been friends since the 1980's. In 1998 Zebrasky took Valdes to a 100 acre property known as Pine Lake Reserve and the two men decided to purchase the property and develop an approximate 300 multi/duplex residential unit project in four phases. In June 2003 Valdes and Zebrasky entered into an operating agreement to establish Evergreen Land Development, LLC for this purpose. Phase 3 of the four phases was the most critical; it encompassed the majority of the lakefront and lake view properties and had the highest profit margin. Valdes had served as a director of a bank in Puerto Rico and had prior real estate development experience in Florida and Puerto Rico; he had a net worth between 14 and 21 million dollars at the time. Zebrasky lived in Ohio and was self-employed restoring and selling collectable cars.

{¶3} To begin the development process Valdes purchased the Phase 4

parcel using his own funds and loans from lenders in Puerto Rico. After obtaining the necessary permits, Evergreen targeted Phase 1 as the next step in the development of Pine Lake, and Valdes inquired about a loan from Home Savings. From the beginning, Home Savings was aware of Evergreen's plans to purchase the property from Aqua Ohio, a water supply company, and develop the Phase 1, 2, and 3 parcels, with Phase 3 having the greatest potential profit.

**{¶4}** In April 2003, Home Savings approved two separate loans for the purchase and development of the Phase 1 parcel, $1,750,000.00 and $1,200,000.00, which Valdes and Zebrasky signed personally and on behalf of Evergreen. Both loans were secured by mortgages on the Phase 1 and 4 parcels, the personal guarantees of Valdes and Zebrasky, a $150,000 certificate of deposit by Valdes, and a second mortgage on Zebrasky's home. The loan documents were signed June 17, 2003, by Valdes and Zebrasky individually and on behalf of Evergreen, and consisted of cognovit notes, mortgages, a construction loan agreement, and a revolving line of credit. As Evergreen developed Phase 1, Zebrasky was responsible for daily supervision of the project.

**{¶5}** Because the municipal authority refused to issue building permits until a pump station and pipes were in place, in March 2004 Evergreen requested an additional loan to construct a pump station and 2.5 miles of pipe, for which Home Savings approved a third loan of $485,000. On April 23, 2004, Valdes and Zebrasky signed the loan documents personally and on behalf of Evergreen; the loan was secured by their personal guarantees and a mortgage on the Phase 1 and 4 parcels.

**{¶6}** By January 2005, Evergreen had pre-sold a number of units and had used all of the available line of credit for home construction. Evergreen requested another loan from Home Savings to construct a four-plex on speculation, which Home Savings approved for $825,600. This fourth loan was secured by mortgages on the Phase 1 and 4 parcels and by the personal guarantees of Valdes and Zebrasky. On January 7, 2005, Valdes and Zebrasky signed the loan documents personally and on behalf of Evergreen. The grand opening of Pine Lake Reserve occurred in May 2005. In June 2005, Evergreen began construction of the four-plex,

which was subsequently completed.

{¶7}   Also in June 2005 Home Savings approved a $6,215,000 loan as well as an increase in the line of credit to $5,000,000.  The new loans consolidated and refinanced Evergreen's initial two loans for 1.75 and 1.2 million dollars, the $485,000 for the pump station, as well as provided additional financing for the purchase and development of the Phase 2 parcel and the purchase of the Phase 3 parcel. Home Savings also released Valdes' $150,000 certificate of deposit and the second mortgage on Zebrasky's home. The $825,000 loan for the four-plex built on speculation remained as a separate loan.

{¶8}   On August 5, 2005, Valdes and Zebrasky signed the $6,215,000 loan documents personally and on behalf of Evergreen. Valdes signed the $5,000,000 loan personally and both Valdes and Zebrasky signed on behalf of Evergreen.  The loan documents included cognovit notes, mortgages, security agreements, construction loans, the A&D loan and revolving line of credit. The loans were secured by first mortgages on the Phase 1 and 4 parcels, by Valdes and/or Zebrasky's personal guarantee, and by the Phase 2 parcel after it was purchased, which occurred shortly thereafter.

{¶9}   After the refinancing documents were signed, Valdes removed Zebrasky from his role overseeing the development of Pine Lake and replaced him with Jamie Garayua to manage the project; Garayua had no prior experience in construction, lending or residential development. That, and other changes not pertinent to this appeal, resulted in a lawsuit separate from this case between Zebrasky and Valdes.

{¶10}   In May 2006, Valdes asked Home Savings to approve a shift in the Pine Lake development from multi-family units to single-family units. However, in August 2006, Valdes began construction of a single-family home without Home Savings' approval on a parcel that had been designated for a four-plex.  Although he had been removed from his position as the project manager, Zebrasky continued to own 49% of Evergreen and did not approve of the change in plans and filed an unsuccessful lawsuit in an attempt to stop construction of this single family unit.

**{¶11}** In November 2006, Home Savings completed its evaluation of Valdes' request which revealed that housing values were declining, the $6,215,000 loan exceeded the value of the collateral by $898,271, and Evergreen needed $305,657 more than was originally allocated to complete Phase 1. Home Savings proposed a loan reconfiguration in order to proceed with Valdes' proposal to shift the project to single family homes and an agreement was ultimately reached. Pertinent to this appeal, the terms of the reconfigured loan included using funds originally designated for the development of Phase 2 and also to purchase the Phase 3 parcel, and instead using those funds to complete the construction of the single family units in Phase 1 as revised per Valdes' request, and the balance of $151,354 would be allocated to increase Evergreen's interest reserve account.[1] Home Savings also agreed to reimburse Valdes for the single-family home he built without prior approval; Valdes drew those funds from the line of credit on November 21, 2006.

**{¶12}** In January 2007, first Garayua and then Valdes each sent a letter to Home Savings which between them raised two concerns pertinent to this appeal: why $151,354 had not been added to the interest reserve account per the agreement and why funds for the Phase 3 parcel, which Valdes still wanted to purchase, had been removed as part of the restructure. After a series of discussions the reserve account issue was resolved and there was agreement to prepare a separate proposal for another loan to purchase the Phase 3 parcel.

**{¶13}** On April 16, 2007, a loan request was made for $1,610,662 for the purchase and development of the Phase 3 parcel, including allocating $125,000 of the funds for the interest reserve account. The loan committee approved the loan request for only $1,485,662 and required Valdes to deposit $100,000 into the interest reserve account.

**{¶14}** On April 17, 2007, Home Savings sent Valdes a memo which enumerated four conditions on the new loan: a contract to purchase the Phase 3 parcel from Aqua, the seller of the Pine Lake parcels; a satisfactory appraisal; a cash

---

[1] The interest reserve is money borrowed from the bank and used by the borrower to pay interest due on loans; when the interest reserve is exhausted, the borrower is expected to make interest payments from their own funds.

deposit of $100,000; and, assurances that Zebrasky could not interfere with the project.

**{¶15}** In June 2007, Home Savings received and accepted the appraisal for the Phase 3 parcel and also received assurances from Evergreen's attorney that Zebrasky could not interfere with the project. However, the two remaining conditions were not completed. Nonetheless, Valdes requested an increase in the $1,484,662 loan for the purchase and development of the Phase 3 parcel, which was rejected by Home Savings.

**{¶16}** Despite the outstanding conditions, Home Savings began preparing the closing documents for the Phase 3 parcel. On June 15, 2007, Evergreen attempted to exercise its option with Aqua to purchase the Phase 3 parcel, but on June 22, 2007, Aqua informed Evergreen that there were outstanding issues to be resolved before the option could be exercised. Home Savings became concerned that Evergreen would not resolve the issues with Aqua and close on the Phase 3 parcel, but Evergreen assured Home Savings that Evergreen and Aqua planned to meet on August 21, 2007, to resolve the pending issues.

**{¶17}** On October 30, 2007, Valdes assured Home Savings that Evergreen would close on the Phase 3 parcel within two weeks. Valdes also informed Home Savings that he would not spend any more of his own money; he wanted the bank to pay some of his expenses from Phase 3, and to increase the loan by $125,000 so he would not have to make the $100,000 deposit for the interest reserve account.

**{¶18}** On December 6, 2007, with the cooperation of Garayua, a proposal was presented to Home Savings' loan committee to increase the loan to $1,610,000 and not require Valdes to make a $100,000 cash deposit. The loan committee

rejected this proposal, withdrew its previously approved $1,485,662 loan for the purchase and development of the Phase 3 parcel, and instead approved a loan for only up to 50% of the purchase price for the Phase 3 parcel; no funding was offered to develop that parcel.

{¶19} In accordance with the course of dealings between the parties, the loan was to remain open for 21 days with the expectation that the loan documents would be executed within 60 days. Home Savings and Valdes understood there was no commitment by the bank to lend or the borrower to borrow until the loan documents were signed.

{¶20} Shortly after December 6, 2007, Valdes again requested a larger loan in order to purchase the Phase 3 parcel. On December 20, 2007, Home Savings offered to increase the loan to 65% of the purchase price—$260,000—which was the maximum amount that could be lent under bank regulations for a land purchase. In response, Valdes affirmed that in addition to the purchase price for the property, he paid $50,000 for a lake closure fee and $80,000 for a bond. Based on this assurance, Home Savings increased its loan offer to $336,375 in order to purchase the Phase 3 parcel which Valdes accepted. The loan was secured by a mortgage on the Phase 3 parcel and by Valdes' personal guaranty. On January 3, 2008, Valdes signed the loan documents, which included a cognovit note, an unconditional and continuing guarantee, a mortgage and security agreement; this was also the same date the purchase of the Phase 3 parcel closed.

{¶21} Evergreen did not advise Home Savings that Aqua could not close on the Phase 3 parcel until after December 20, 2007. Further, during late 2007 and early 2008, Valdes never looked for another loan for Phase 3.

{¶22} The single-family home that Valdes constructed in 2006 never sold. There were no presold lake front units for Phase 3 in 2007 as there had been for Phase 1 in 2005. Regarding the four-plex Evergreen built on speculation in 2005, only two of the four units were sold by short sales in 2008. After August 2005, there were no sales at the Pine Lake development.

{¶23} After Evergreen purchased the Phase 3 parcel, Valdes decided not to

develop that parcel, and in April 2008 informed Home Savings that he was not going to invest further in the Pine Lake project or make any more payments on the outstanding debt. Valdes also told Home Saving that he wanted financial assistance from the bank for expenses.

**{¶24}** In default are the $825,600 and $6,215,000 notes signed by Valdes, Zebrasky and Evergreen; the $5,000,000 note signed by Valdes and Evergreen; and, the $336,375 note signed by Evergreen and personally guaranteed by Valdes. All four parcels are encumbered by recorded mortgages in varying combinations.

## Procedural History

**{¶25}** Home Savings initiated the instant litigation in 2008 by seeking and obtaining cognovit judgments against Evergreen, Valdes and Zebrasky, which were vacated later that year. The case proceeded to bench trial on February 7, 2011 before the magistrate, resulting in three decisions on May 31, 2011, September 20, 2011 and August 15, 2012.[2]

**{¶26}** The May 31, 2011 magistrate's decision made a total of 115 findings of facts, most of which are detailed in the factual history of this opinion. The magistrate made thirty-two conclusions of law, including pertinent to this appeal: judgment in favor of Home Savings on all four notes and granting foreclosure relief; awarding Home Savings reasonable attorney fees and costs from Evergreen; and judgment in favor of Home Savings on Evergreen, Valdes, and Zebrasky's counterclaims.

**{¶27}** The magistrate further determined in the May 31, 2011 decision that the equitable estoppel claim asserted by Evergreen, Valdes and Zebrasky does not afford them affirmative relief and therefore is not a counterclaim; further concluding that equitable estoppel requires a factual misrepresentation inducing reasonable, detrimental reliance, and they presented no evidence of a factual misrepresentation by Home Savings regarding the loan for Phase 3. The magistrate similarly found that there was no evidence presented of a factual misrepresentation, and accordingly rejected the claims of fraudulent inducement and negligent misrepresentation. The

---

[2] Because foreclosure relief was sought other parties with claims were named, but their status is not pertinent to this appeal.

magistrate finally determined that those claims accrued to Evergreen as the corporate entity not its equity owners, and therefore rejected Valdes' personal assertion of those counterclaims.

**{¶28}** The magistrate reserved the determination of attorney fees and costs for a hearing on August 5, 2011, and awarded Home Savings $355,673.71 in attorney fees and $23,264.31 for expenses against Evergreen in a second magistrate's decision dated September 20, 2011. Evergreen, Valdes and Zebrasky timely filed objections to the first two magistrate's decisions.

**{¶29}** On April 10, 2012, instead of ruling on the objections, the trial court remanded the case to the magistrate for a determination of whether Valdes and Zebrasky were required to plead the affirmative defense of being an accommodation maker and if so, when; and if properly raised for a determination as to whether either or both were accommodation makers. On April 24, 2012, a hearing was held before the magistrate pursuant to the trial court's remand.

**{¶30}** The August 15, 2012 magistrate's decision determined that Valdes and Zebrasky's assertion that they were accommodation makers is an affirmative defense; as such, they were required to assert the affirmative defense in either a Civ.R. 12(B) motion to dismiss, in an answer to the complaint, or in an amendment of the pleadings pursuant to Civ.R. 15. The magistrate found that neither Valdes nor Zebrasky raised this affirmative defense even after Home Savings introduced the notes at trial and they testified regarding the notes; specifically, the record demonstrated that neither man nor any other witness ever used the words accommodation party or maker. The first time Valdes and Zebrasky raised the affirmative defense was in their objections to the May 31, 2011 magistrate's decision, which does not comport with the Civil Rules. Consequently, the magistrate held that the defense was waived. The magistrate further held that regardless of the failure to assert the defense, both Valdes and Zebrasky had signed the notes as makers, not as accommodation parties, thereby making them jointly and severally liable. Valdes and Zebrasky consented to and authorized the reconfiguration of the loans, thus their liability to pay on the notes was unconditional and absolute and the bank was

permitted to execute the judgment against all defendants.

**{¶31}** Evergreen, Valdes and Zebrasky objected to this third magistrate's decision, and on November 19, 2012, the trial court adopted the August 12, 2012 magistrate's decision in its entirety. However, the remaining objections were not addressed by the trial court.

**{¶32}** After an attempted appeal and a remand from this court, the trial court ruled on all three objections on January 15, 2013 and adopted the magistrate's three decisions in their entirety. On March 20, 2013, the trial court issued a decree in foreclosure entering judgment on and prioritizing the various liens and claims on the four parcels.

**{¶33}** After Evergreen and Valdes filed their appeal, and Zebrasky separately appealed, the parties filed multiple pre-merit determination procedural motions in both the trial court and this court including motions to hold the appeal in abeyance, to dismiss the appeal and to stay execution. Evergreen and Valdes have jointly asserted eleven assignments of error and Zebrasky has separately stated three, which are substantively the same as those raised by Evergreen and Valdes. For clarity of analysis, the assignments of error will be addressed out of order and/or together as noted.

## Discovery

**{¶34}** Evergreen and Valdes' first of eleven assignments of error asserts:

> The trial court erred in denying Evergreen and Valdes the opportunity to pursue discovery to make and defend the claims in this case.

**{¶35}** A trial court has broad discretion in discovery matters and challenges are reviewed for abuse of discretion. *Estate of Hohler v. Hohler,* 197 Ohio App.3d 237, 2011-Ohio-5469, 967 N.E.2d 219, ¶ 26. (7th Dist.) "An abuse of discretion means an error in judgment involving a decision that is unreasonable based upon the record; that the appellate court merely may have reached a different result is not enough." *See Bergman v. Bergmann,* 2d Dist. No. 25378, 2013–Ohio–715, ¶ 9; *Hall–*

*Davis v. Honeywell, Inc.,* 2d Dist. Nos. 2008 CA 1, 2008 CA 2, 2009–Ohio–531, ¶35. "Determinations during the course of discovery will not be reversed in the absence of an abuse of discretion that prejudicially affects the substantial rights of the parties." *Estate of Banfield v. Turner,* 131 Ohio App.3d 213, 216, 722 N.E.2d 136 (7th Dist. 1999), citing *State ex rel. Daggett,* 34 Ohio St.2d 55, 58, 295 N.E.2d 659 (1973).

**{¶36}** Evergreen and Valdes argue that the trial court denied them the opportunity to view key documents and depose key witnesses by denying their motion to compel, and instead ending discovery. They contend that they sent their first set of interrogatories and request for production of documents to Home Savings on January 8, 2010, and Home Savings only partially responded to the request just before the trial date in December of 2010. They contend that despite their efforts, Home Savings continually refused to provide discovery. Evergreen and Valdes stress that they filed a motion to compel—which the magistrate denied—once they understood that Home Savings would not cooperate in January of 2011. Evergreen and Valdes further urge that the requested discovery was essential to their defenses and counterclaims and left them without a complete understanding of Home Saving's case theory.

**{¶37}** Home Savings counters that despite having two years[3] to conduct discovery, Evergreen and Valdes failed to: serve a notice of deposition for Home Savings' witnesses; subpoena a third-party witness; follow up on Home Savings' responses until eight months later; and waited to raise these issues until just days before the trial. Further, the requested discovery was duplicative of what was already produced, did not exist, or was not relevant to any defense or counterclaim.

**{¶38}** All parties were given sufficient time to conduct discovery. Originally, the trial court gave Home Savings until November 1, 2009, and Evergreen and Valdes until December 1, 2009, to conduct discovery, with a trial date of April 14, 2010. Thereafter, the trial court modified the pre-trial/trial schedule and gave Home Savings until December 15, 2009, and Evergreen and Valdes until January 15, 2010 to conduct discovery. The trial court again modified the schedule and gave Home

---

[3] Home Savings is using the date of the complaint as the starting date which is misleading as it originally obtained a cognovit judgment against Evergreen and Valdes, which was later vacated.

Savings until March 15, 2010, and Evergreen and Valdes until April 12, 2010, to conduct discovery, with a revised trial date of December 20, 2010. Further, the trial court provided at least one 30-day extension to Home Savings to respond to a discovery request and also granted Evergreen and Valdes' motion to continue trial from December 20, 2010 to February 7, 2011. Thus, the trial court gave all parties ample time to conduct discovery and prepare for trial.

{¶39} Evergreen and Valdes requested depositions of two Home Savings' employees and a third party witness approximately 11 days prior to trial. Evergreen and Valdes filed a motion to compel after Home Savings did not make these individuals available and the trial court denied the motion. By this point, Home Savings had produced over 5,000 documents. Evergreen and Valdes claim that this information was necessary to "develop their defenses and counterclaims with respect to Home Savings' unsafe and unsound banking practices."

{¶40} Home Savings counters that the FDIC order deals exclusively with requirements to limit exposure to bad loans, to safeguard its deposits and to improve collections—nothing that is related to the bank's treatment of borrowers. As such, the FDIC order was not material and/or relevant. The trial court must balance the relevance of the discovery request, the party's need for discovery, and the hardship upon the party from whom the discovery is requested. See *Huebner v. Miles*, 92 Ohio App.3d 493, 501, 636 N.E.2d 348 (1993).

{¶41} In light of the amount of time Evergreen and Valdes had to conduct discovery, the untimeliness of their contempt motion, and the information being irrelevant, the trial court did not abuse its discretion denying Evergreen and Valdes' motion to compel. Accordingly, their first assignment of error is meritless.

### Waiver of Accommodation Maker Status

{¶42} Evergreen and Valdes' second and fourth of eleven assignments of error assert:

The trial court erred in finding that Valdes' defenses based on Valdes' status as an accommodation maker to the notes were barred.

The trial court erred in finding that Valdes was not an

accommodation maker.

**{¶43}** Zebrasky asserts in his first, second and third assignments of error:

The trial court committed error prejudicial to appellant by ruling that his defense, based on his status as an accommodation maker/guarantor was barred.

The trial court committed error prejudicial to appellant by ruling that he was not an accommodation maker/guarantor on the note in question.

The trial court committed error prejudicial to appellant by ruling that actions by plaintiff materially changing the terms and conditions of the loan in question over appellants' objection, did not excuse appellant from his obligations as an accommodation maker/guarantor.

**{¶44}** "[P]urely legal issues, and the trial court's application of the law to the facts, are subject to de novo review." *State v. Moore,* 161 Ohio App.3d 778, 2005–Ohio–3311, 832 N.E.2d 85, ¶ 36 (7th Dist.); *Baird Bros. Sawmill, Inc. v. Augusta Const.,* 7th Dist. No. 98–CA–152, 2000 WL 817068, *2 (June 19, 2000). *Fifth Third Bank, N.A. v. Maple Leaf Expansion, Inc.,* 188 Ohio App.3d 27, 2010–Ohio–1537, 934 N.E.2d 366, ¶10 (7th Dist.).

**{¶45}** It is perplexing that the trial judge remanded the case back to the magistrate for a determination of whether Valdes and Zebrasky were required to plead the affirmative defense of being an accommodation maker when the entire trial was completed and the issue had not been raised until it was asserted in their objections; thus, the magistrate could not be faulted for failing to consider the issue when it was never raised at trial. Regardless, as the matter was not raised in any pre-trial pleadings or at the trial itself, this issue is waived.

**{¶46}** The magistrate found in the August 15, 2012 decision that when Valdes and Zebrasky testified at trial, they never used the terms accommodation party or maker, or gave any indication that their testimony was offered in any way to support

that affirmative defense; additionally, they did not raise it in a motion to dismiss or in their answers, or seek to amend pursuant to Civ.R. 15. The magistrate further found that Valdes conceded that the first time the affirmative defense was raised was in their objections to the May 31, 2011 magistrate's decision. However, the magistrate alternatively found that the record demonstrates that Valdes and Zebrasky were identified as borrowers in the notes, and that there was no limiting or qualifying language that would suggest that they signed the notes as anything other than principal makers.

{¶47} Valdes and Zebrasky argue the defense was not waived, but rather tried by implied consent as contemplated by Civil Rule 15. They acknowledge that the phrase accommodation maker was not mentioned at trial but contend evidence was introduced regarding the Evergreen loans including: allocation of loan funds; manner of repayment; parties' intentions in development; release of mortgages; and modifications. Home Savings contends that the parties were not aware that an unpleaded issue had entered the case.

{¶48} First, as correctly found by the magistrate, Valdes and Zebrasky failed to assert the affirmative defense in either a Civ.R.12(b)(6) motion or in any of the answers they filed. Second, when determining whether parties have tried an unplead issue by implied consent a trial court must consider:

> (1) 'whether they recognized that an unpleaded issue entered the case'
> (2) 'whether the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be retried on a different theory' and (3) 'whether the witnesses were subjected to extensive cross-examination on the issue.' *State ex rel. Evans [v. Bainbridge* (1983)], 5 Ohio St.3d [41] at 45-46, 448 N.E.2d 1159. Further, a party's failure to object when evidence relating directly to the unpleaded issue is introduced does not establish implied consent. *Id.* at 46, 448 N.E.2d 1159. Instead, it must appear that the parties understood the evidence was aimed at the unpleaded issue. *Id. Sheperak v. Ludlow,* 6th Dist. No. F03-011, 2004-Ohio-3155, at ¶16.

*Woodward v. Kleese,* 11th Dist. No. 2007-T-0002, 2007-Ohio-5218, ¶24.

**{¶49}** A review of the trial record demonstrates that the *Woodward* factors are not present. There is no mention of implied consent. The transcript reveals that there was no cross examination on this issue, nor do Valdes or Zebrasky direct our attention to any. More importantly, they failed to file a motion to conform the pleadings to the evidence pursuant to Civ.R. 15. Tellingly, Valdes conceded this issue was not presented at trial, acknowledging it was raised for the first time in their objections.

**{¶50}** Accordingly, the issue regarding Valdes and Zebrasky's status as accommodation makers is waived; thus Evergreen and Valdes' second and fourth assignments of error and Zebrasky's first, second and third are meritless.

### Counterclaims Raised By Shareholders in Personal Capacity

**{¶51}** Evergreen and Valdes' third and ninth of eleven assignments of error assert:

The trial court erred in finding that Valdes could not personally bring his counterclaims.

The trial court erred in finding that Valdes [and Evergreen's][4] promissory estoppel and negligent misrepresentation claims were without merit.

**{¶52}** The issue of standing presents a question of law which is subject to de novo review. *Moore*, supra. Generally, "a plaintiff-shareholder does not have an independent cause of action where there is no showing that he has been injured in any capacity other than in common with all other shareholders as a consequence of the wrongful actions of a third party directed towards the corporation." *Adair v. Wozniak,* 23 Ohio St.3d 174, 178, 492 N.E.2d 426 (1986). "The personal loss and liability sustained by the shareholder is both duplicative and indirect to the corporation's right of action." *Id.* However, "[a] complaining shareholder has a direct action only if he sustains a loss separate and distinct from that of the corporation."

[4] Although only Valdes was identified in the assignment of error in the joint brief filed by Evergreen and Valdes, in the body of the brief these arguments are asserted by Evergreen as well.

*Turner v. CTW Dev. Corp.,* 7th Dist. No. 12-MA-124, 2013-Ohio-4455, ¶ 21 (internal citations omitted).

**{¶53}** Valdes argues that his injury is unique and not duplicative of Evergreen and Zebrasky's injury as he invested and lost millions of his own money in the Pine Lake development whereas Zebrasky did not. Home Savings responds that any claims belong to Evergreen and cannot be asserted by Valdes; the claims are not separate but rather rooted in the loans extended to Evergreen.

**{¶54}** Although Valdes invested substantial sums into Evergreen, he admitted doing so in the form of a loan to Evergreen and anticipated repayment. His injury is not unique; Evergreen's financial losses were the same as Valdes'. "[T]he cause of action accrues to the corporation, not to the shareholders, even though in an economic sense real harm may well be sustained by the shareholders as a result of reduced earnings, diminution in the value of ownership, or accumulation of personal debt and liabilities from the company's financial decline. The personal loss and liability sustained by the shareholder is both duplicative and indirect to the corporation's right of action." *Adair* at 178. As Valdes failed to demonstrate a separate, distinct injury, he cannot pursue individual claims against Home Savings. Accordingly, Evergreen and Valdes' third assignment of error is meritless.

**{¶55}** Evergreen and Valdes' ninth assignment of error asserts that the trial court erred in finding that the promissory estoppel and negligent misrepresentation claims were meritless, framing the issue in terms of both sufficiency and manifest weight of the evidence. This raises the preliminary issue of whether Evergreen's promissory estoppel claim was properly before the trial court or if it has been waived. As discussed above, Valdes cannot personally assert any claims against Home Savings, and the ninth assignment of error is meritless as to Valdes.

### Waiver of Distinct Estoppel Theory

**{¶56}** As stated by the Tenth District, "[t]he difference between the doctrines [of equitable estoppel and promissory estoppel] can best be explained by observing that promissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would

have, or from instituting an action which it is entitled to institute. Promissory estoppel is a sword, and equitable estoppel is a shield." *Holt Co. of Ohio v. Ohio Machinery Co.,* 10th Dist. No. 06-AP-911, 2007-Ohio-5557, ¶28, citing *Jablon v. U.S.,* 657 F.2d 1064 (9th Cir.1981).

**{¶57}** Evergreen concedes on appeal, as it had in its objections to the May 31, 2011 magistrate's decision, that the magistrate correctly determined equitable estoppel does not authorize affirmative relief and therefore is not a counterclaim. However, in an attempt to now assert a claim of promissory estoppel, Evergreen argues that according to *Holt,* where equitable estoppel is pled, the court is to construe the claim as a promissory estoppel; thus it has preserved this theory of recovery. Home Savings counters that this argument is waived; Evergreen only pled equitable estoppel and the distinct claim of promissory estoppel was not advanced at any point before or during trial, raising the theory for the first time in its objections and on appeal.

**{¶58}** In *Holt,* the plaintiff asserted a claim of estoppel in his amended complaint without specifying whether he was asserting equitable estoppel or promissory estoppel. *Holt* at ¶5. In determining whether the claim was equitable estoppel or promissory estoppel, the Court stated "[b]ecause promissory estoppel, not equitable estoppel, properly is used to create a cause of action, we construe Holt's 'estoppel' claim in its first amended complaint as a claim of promissory estoppel." *Id.* at ¶ 29.

**{¶59}** *Holt* is distinguishable from this case. Evergreen is attempting to switch between distinct theories of estoppel; it originally pled *equitable* estoppel and is now asserting for the first time *promissory* estoppel. Conversely, the issue in *Holt* was identifying which distinct theory of estoppel applied where estoppel was pled generically.

**{¶60}** The two theories have different elements and serve different purposes; they are distinct and not interchangeable. The theory of promissory estoppel was not before the trial court, thus, Home Savings did not have an opportunity to defend against that claim. Accordingly, Evergreen's promissory estoppel argument is waived.

**Negligent Misrepresentation**

**{¶61}** Evergreen preserved this claim and raises sufficiency and manifest weight of the evidence challenges. When reviewing sufficiency of the evidence we look to "[w]hether the evidence is legally sufficient to sustain a verdict", which is a question of law. *Eastley v. Volkman*, 132 Ohio St.3d 328, 972 N.E.2d 517 at ¶ 11, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. Thus, sufficiency of the evidence is reviewed de novo. *J. Bowers Constr., Inc. v. Gilbert*, 2014-Ohio-3576, 18 N.E.3d 770, ¶ 21 (9th Dist.). Appellate courts are more constrained when considering manifest weight challenges; "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Eastley* at ¶ 14, citing *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978). And as Evergreen is asserting the trial court erred in adopting the magistrate's decision, "[a]n appellate court reviews a trial court's ruling on a magistrate's decision only for abuse of discretion." *Kniszek v. Kniszek,* 7th Dist. No. 08 JE 30, 2009-Ohio-3249, at ¶ 26, citing *Briarwood v. Bratanov,* 9th Dist. No 23318, 2007-Ohio-2476, ¶ 9.

> One commits negligent misrepresentation when 'in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, [he] supplies false information for the guidance of others in their business transactions, [and he] is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.' *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835.

*Davis v. Montenery*, 173 Ohio App.3d 740, 752, 2007-Ohio-6221, 880 N.E.2d 488, 497, ¶ 58 (7th Dist.).

**{¶62}** At trial and on appeal Evergreen seems to advance an estoppel argument as opposed to a negligent misrepresentation claim. Evergreen alleged that

certain documents reveal that Home Savings had approved the 1.4 million dollar loan to purchase and develop the Phase 3 parcel and that the Home Savings' employees believed that the documents were a commitment to provide the loan. Evergreen asserts that months later, with only an explanation of economic considerations, Home Savings backed out of the loan knowing the effect that this would have on Evergreen's ability to continue with Phase 3.

{¶63} Home Savings responds by arguing that Evergreen has failed to show any evidence that Home Savings supplied Evergreen with false information, highlighting that Evergreen's brief actually argues the opposite; that Home Savings had approved the loan, which was subject to conditions which were not met and then withdrew the loan approval. In order to prevail, Home Savings asserts that Evergreen would need to prove that Home Savings had no intention of loaning Evergreen the money, which Evergreen does not argue and has failed to provide any evidence to support such a contention.

{¶64} To prevail on a negligent misrepresentation claim the plaintiff must prove that the defendant provided false information. Evergreen has failed in this regard.

{¶65} Evergreen ignores that the record demonstrates on December 6, 2007, the date Home Savings withdrew the 1.4 million dollar loan offer, two required conditions had not been met. First, a signed contract for the Phase 3 parcel had not been executed. Moreover, Valdes failed to advise Home Savings that Aqua would not do so until after December 20, 2007, instead repeatedly assuring the bank during June through the end of October 2007 that the purchase would close within two weeks. The closing actually took place on January 3, 2008, the same day Evergreen and Valdes signed the $336,375 loan to purchase that parcel and reimburse Valdes for expenses. Second, Valdes had not paid or tendered $100,000 for the interest reserve account. Instead, on October 30, 2007, Valdes told Home Savings he was not going to personally invest any more funds in Phase 3, and asked that the loan be increased by $125,000 in order to fund the interest reserve account so he would not have to make the $100,000 deposit.

**{¶66}** As a result, Home Savings authorized a loan representing 50% of the price to purchase the parcel only; later, on December 20, 2007, the bank agreed to increase the amount of the loan to 65% of the purchase price and additional funds to reimburse Valdes for some of the expenses he incurred in order to purchase that parcel. Evergreen ignores that it never pursued any other loans to develop Phase 3, and that in April 2008, three months after the final loan documents were signed and the funds disbursed, Valdes decided not to develop the Phase 3 parcel and informed Home Savings that he was not going to invest further in the Pine Lake project or make any more payments on the outstanding debt.

**{¶67}** Evergreen has not proven that Home Savings provided false information. Sufficient competent and credible evidence exists to support the trial court's finding that Evergreen had not proven the elements of negligent misrepresentation. As such, the trial court did not abuse its discretion in adopting the magistrate's decision, and Evergreen's negligent misrepresentation argument is meritless. Accordingly, Evergreen's ninth assignment of error regarding promissory estoppel and negligent misrepresentation is meritless.

### Discharge Not Warranted-Bilateral Loan Modification

**{¶68}** Evergreen and Valdes' sixth of eleven assignments of error asserts:

> The trial court erred in failing to find that Valdes' obligations under his personal guarantees were discharged by Home Savings' unilateral modification of the 2005 A&D loan.

**{¶69}** Evergreen and Valdes argue that Home Savings unilaterally modified the terms of the 6.2 million dollar loan without Valdes' consent, therefore Valdes' personal guarantee is discharged. Home Savings counters that Valdes requested, negotiated and agreed to the reconfiguration.

**{¶70}** Valdes requested the modification in May 2006, and not only consented to the terms, but received funds pursuant to those terms, and also requested and obtained a separate loan from Home Savings consistent with the reconfigured loan in order to purchase the Phase 3 parcel. Originally the Pine Lake plan contemplated

multi-family units and Valdes wanted to change that plan and increase the number of single-family units from 12 to 49; moreover, he commenced construction of a single-family unit without Home Savings' approval while the bank was evaluating his proposal.

{¶71} In November 2006, Home Savings completed its evaluation of Valdes' request which revealed the $6,215,000 loan exceeded the value of the collateral by $898,271, and Evergreen needed $305,657 more than was originally allocated to complete Phase 1. A loan reconfiguration was necessary to proceed with Valdes' request to shift the project to single-family homes and an agreement was ultimately reached after extensive negotiations between Valdes and Home Savings. The terms of the reconfigured loan included using funds originally designated for the development of Phase 2 and to purchase the Phase 3 parcel, and reallocating them in order to complete the construction of the single family units in Phase 1 as revised per Valdes' request, and the balance of $151,354 would be allocated to increase Evergreen's interest reserve account. Home Savings also agreed—as a term of the reconfigured 6.2 million dollar loan—to reimburse Valdes for the single-family home he built without prior approval; Valdes received those funds on November 21, 2006.

{¶72} Further, after additional months of negotiations, consistent with the reconfigured 6.2 million dollar loan, Valdes and Home Savings agreed to a separate loan for $336,375 to purchase the Phase 3 parcel, which was secured by a mortgage and Valdes' personal guaranty. On January 3, 2008, Valdes signed those loan documents.

{¶73} The record demonstrates Home Savings did not unilaterally modify the $6,250,000 loan. Valdes instigated the modification in order to change the original purpose of the Pine Lake plan by shifting the project from a focus on multi-plex to single family units. This necessitated reconfiguring the terms of the loan. Valdes negotiated and agreed to the terms, including accepting reimbursement of expenses. He also obtained a subsequent loan to purchase the Phase 3 parcel, which was to have been purchased from funds from the original loan. Accordingly, Evergreen and Valdes' sixth assignment of error is meritless.

## Damages and Judgment

**{¶74}** Evergreen and Valdes' fifth, seventh and eighth assignments of error assert:

The trial court erred in failing to offset Home Savings' claims by the amount of collateral that Home Savings released.

The trial court erred in failing to include in its order language preventing execution on the judgment against Valdes until a deficiency judgment exists.

The trial court erred in determining that the unpaid principal on the 2005 A&D loan was $3,435,940.34.

**{¶75}** As Evergreen and Valdes frame their arguments in terms of sufficiency and manifest weight of the evidence, both will be discussed, and the appropriate standard of review for each is set forth above.

**{¶76}** Regarding mitigation of damages, this Court has held that "[i]t is a fundamental principle of damages that one injured in his person or property by a wrongful act or wrongful omission to act, whether as a result of a tort or a breach of contract, must use reasonable care to avoid loss or to minimize the damages resulting." *Commercial Credit Services Corp. v. David Sugar, Inc.,* 7th Dist. No. 84 CA 163, 1986 WL 2504 *4 (Feb. 25, 1986), citing 30 Ohio Jurisprudence 3d 20, Damages, Sec. 16. Further, "the party sued for damages has the burden of establishing matters in mitigation or reduction of the amount of the other party's damages." *Commercial Credit, *4,* citing 22 American Jurisprudence 395, Damages, Sec. 297.

**{¶77}** Evergreen and Valdes argue that Home Savings voluntarily, without knowledge or consent, released the second mortgage it had against Zebrasky's home which had served as collateral for Evergreen's loans, contending the release resulted in a failure to mitigate damages and that Evergreen and Valdes are not responsible for Home Savings' voluntarily relinquishment of collateral. Home Savings

responds by arguing that the mortgage for Zebrasky's home was extra collateral for the 2003 loan which was paid off through the refinancing provided by the 2005 loan and that Valdes had knowledge of and consented to the release.

{¶78} A June 16, 2005, Construction Loan Submission Summary discusses the terms and conditions of the $6,215,000 loan. The mortgage on Zebrasky's home was collateral for the $1,750,000 loan, which was paid off through the refinancing of the $6,215,000 loan. As such, Home Savings properly released the mortgage. Evergreen and Valdes also ignore that Valdes' $150,000 certificate of deposit was released as security for the $1,750,000 loan at the same time and for the same reason that the mortgage on Zebrasky's home was released. Further, the release of Zebrasky's mortgage occurred in 2005 and the default did not occur until 2008. It is illogical that a duty to mitigate can occur before a default, as there are no damages to mitigate at that point. Thus, there is competent and credible evidence supporting the trial court's judgment and the ruling is not against the manifest weight of the evidence. Accordingly, Evergreen and Valdes' fifth assignment of error is meritless.

{¶79} Evergreen and Valdes contend the trial court further erred in failing to include language preventing execution on the judgment against Valdes until a deficiency judgment existed, citing *Marion Development Co. v. Bruce*, 39 Ohio App. 253, 177 N.E. 471 (1931). Home Savings distinguishes *Marion* as that case was a foreclosure action involving an individual who was secondarily, not primarily liable. Evergreen and Valdes also rely on R.C. 2329.54, but that statute provides protection for sureties. As discussed above, Valdes is jointly and severally liable on the note as a principal maker. As such, Home Savings can collect against him before obtaining a deficiency judgment. Thus, Evergreen and Valdes' seventh assignment of error is meritless.

{¶80} Evergreen and Valdes further argue that the trial court erred in its calculation of the unpaid principal on the $6,215,000 loan. Evergreen and Valdes argue that the magistrate found that the principal amount due on the loan was $3,435,940.34; however, the amount owed on the principal is actually $3,050,577.75,

a $400,000 difference that will be subject to default-rate interest,[5] and further argue that because they did not draw on the loan after January 30, 2007, the amount owed should not have changed after that date.

**{¶81}** Home Savings counters that Evergreen and Valdes did not object to testimony and evidence regarding the amount owed on the principal at trial; specifically, plaintiff's exhibit 112, which was a chart admitted into evidence and summarizing testimony given by Home Savings personnel regarding the principal, interest and late charges due, as well as the default date and the default interest rate for each note as of February 7, 2011, the date the trial commenced. Second, Home Savings argues Evergreen and Valdes did draw on the account after January 30, 2007.

**{¶82}** The trial court's ruling is not against the manifest weight of the evidence. A review of the record demonstrates that the amount of principal due varied over time; for example as of April 16, 2007, the loan had a principal balance of $3,290,131.50. The $6,215,000 loan documents state that funds were included in the loan to pay loan fees and interest. $500,000 was built into the loan and allocated in the interest reserve in order to make these payments. Draws were made over time to make payments on the accumulating interest on the note up to the time of default.

**{¶83}** The May 31, 2011, magistrate's decision found that there was due and owing on the 6.2 million dollar note through February 7, 2011, $4,378,298.18, specifically referencing plaintiff's exhibit 112. As the trier of fact the magistrate was in the best position to evaluate the credibility of the testimony and evidence presented. As there is competent, credible evidence supporting the magistrate's decision, the trial court did not error in finding the principal balance of the loan as of February 7, 2011, was $3,435,940.34. Accordingly, Evergreen and Valdes' eighth assignment of error is meritless.

---

[5] Evergreen and Valdes rely on plaintiff's exhibit 42 in support of this position, describing it as Home Savings' January 30, 2007 Construction Loan Department Cost Breakdown Detail. However, that document is a January 30, 2007 letter from the bank to Valdes confirming a conversation that morning regarding reconfiguring the 6.2 million dollar loan by reallocating funds in order to, inter alia, finish Phase I and infuse funds into the interest reserve account. The letter also confirmed discussions about preparing a separate loan to purchase the Phase 3 parcel. It does not contain any information regarding the balance due on the 6.2 million dollar loan.

**Attorney Fees and Priority**

{¶84} Evergreen and Valdes' tenth and eleventh assignments of error assert:

The trial court erred in awarding Home Savings the full amount in attorneys' fees.

The trial court erred in placing the attorneys' fee before the notes in priority to be paid out of the proceeds of a foreclosure sale.

{¶85} An appellate court reviews an award of attorneys' fee for an abuse of discretion and "must use its power of review to reverse if the amount of fees is so high or low as to shock the conscience." *B-Right Trucking Co. v. Interstate Plaza Consulting,* 154 Ohio App.3d 545, 2003-Ohio-5156, 798 N.E.2d 29, ¶ 71 (7th.Dist.). As such, the appellate court accepts "that the trial court generally has a better opportunity to determine the value of the services in each case where it participated in the preliminary proceedings." *Id.*

{¶86} When a commitment to pay attorneys' fee is present in a contract, the clause "is enforceable only to the extent that it obligates payment of a reasonable amount. In determining the amount of attorneys' fees that is reasonable, all relevant factors shall be considered, including but not limited to, the nature of the services rendered, the time expended in rendering the services, the amount of money and the value of the property affected, and the professional skill and expertise of the attorney or attorneys rendering the services." R.C. 1319.02(D).

{¶87} Further, "[u]nless a court has been requested to make a determination of the amount of attorneys' fees that is reasonable and finds to the contrary by a preponderance of the evidence, the following are deemed reasonable amounts: * * * (2) If the commitment to pay attorneys' fees is not based upon a specific percentage of the total principal, interest, and other charges owed on the contract of indebtedness, an amount equal to the attorneys' fees customarily charged by the attorney or attorneys rendering the services." R.C. 1319.02(D)(2).

{¶88} Evergreen and Valdes argue that the amount awarded to the three out-of-town law firms representing Home Savings shocks the conscience as the trial

court awarded the full amount of fees and expenses requested, $378,938.02, without proof of payment, invoices, or evidence specifying the attorneys' fees for those who worked on the case. Additionally, they argue that the award is outside the local and customary charges of the Youngstown/Warren area; that Home Savings' own expert could not identify any local lawyer who charged at the rate of the bank's counsel, noting that Home Savings' expert charges $165/hour for similar work, less than half of what Home Savings' lead attorney, DiPalma, charged. In essence, Evergreen and Valdes are challenging Home Savings' decision to hire firms from the greater Northeast Ohio area and Florida rather than local counsel from Mahoning County.

{¶89} Home Savings counters that there is credible evidence supporting the fees, including detailed invoices and the expert testimony and report from David Shepherd, a Warren, Ohio attorney with thirty-years of commercial litigation experience. Home Savings argues that Shepherd testified that the rates were reasonable based on the complexity of the case and are in line with other firms in Northeast Ohio. Finally, Home Savings argues that Evergreen and Valdes' reliance on Prof.Cond. R. 1.5 is misplaced as it is an ethical rule, not a substantive rule or statute, as such, R.C. 1319.02(D)(2) should control evaluation of the attorney fees award.[6]

{¶90} Additionally, and contrary to Home Savings' argument, when evaluating the reasonableness of attorney fees the Ohio Supreme Court held it is proper to also consider the factors set forth in Prof. Cond. Rule 1.5. See *Bittner v. Tri-County Toyota*, 58 Ohio St.3d 143, 145-146, 569 N.E.2d 464 (1991). This is consistent with the inclusive language in R.C. 1309.02(D) that all relevant factors shall be considered. Pertinent to this appeal, Shepard based his expert report and testimony on the factors delineated in Prof.Cond. Rule 1.5, and relied on the following six of the nine factors delineated in the rule:

---

[6] The magistrate's September 20, 2011 decision is based on R.C. 1301.21(A), repealed on June 29, 2011 and replaced with R.C. 1319.02(D), which states the same substantive law as R.C. 1301.21(A). As the substance of the law remains the same the analysis is not affected; however, the new section number will be referenced herein.

1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

* * *

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

Prof.Cond.R. 1.5(a).

{¶91} The magistrate's decision notes that the attorney fees and cost award was based upon testimony presented and exhibits admitted at a full evidentiary hearing; specifically the report and testimony of Home Savings' expert Attorney Shepard, the detailed invoices from all three firms, a summary sheet tallying the fees and expenses for all three firms, and biographical information for Attorney Douglas DiPalma of Cavitch, Familo & Durkin, who was the lead attorney for the litigation from March 2009 through April 2011. Evergreen, Valdes and Zebrasky did not present an expert to counter Shepard's testimony or report.

{¶92} Three law firms represented Home Savings during the pre-trial, trial and post-trial proceedings of the six cases consolidated in this appeal. Common to the invoices in the record submitted by all three firms is that Home Savings was billed monthly, expenses were detailed, and entries for work done was were detailed by date, professional, time spent and a description of the work performed. The Cavitch firm, as well as Messana, Weistein & Stern P.A. also provided the individual hourly rates for each professional who performed services at both firms. However, Weston Hurd L.L.P. did not provide the individual hourly rate for its professionals. Instead,

Weston provided the total number of professional hours for work performed for the month and the total dollar amount billed for those services. Accordingly, Shepard evaluated the reasonableness of Weston's attorney fees by dividing the total dollar amount of professional services billed by the hours expended to arrive at a blended average hourly rate of $159.09 for all professional service rendered by Weston.

{¶93} All three firms also redacted information in the description portion of the invoices from a number of entries in order to preserve attorney-client privileged information therein. Accordingly, Shepard opined that he could not speak to the reasonableness of any of those redacted entries.

{¶94} In his report Shepard stated that in order to evaluate the reasonableness of the attorney fees for services rendered on behalf of Home Savings by all three firms in connection with the litigation and collection efforts, he reviewed the detailed monthly invoices from each firm, the complaints, answers and counterclaims filed in all three cases, as well as the other pleadings, motions, filings related to discovery, journal entries and the official online docket for all three cases. His report also detailed his knowledge of the reputation of both Cavitch and Weston, attorney billing rates in the Mahoning County legal community and the reputation of Attorney DiPalma as lead counsel for the matter. At the hearing, he reiterated his reliance on this information, as well as the biography of Attorney DiPalma and the billing summaries for each firm, which were also admitted at the hearing; he also testified that he had reviewed the biographies of attorneys Black and Trombetto.

{¶95} Shepard opined in his expert report that the invoices disclosed necessary and appropriate work including but not limited to: document review and evaluation of background facts; legal research before and during litigation; ongoing communications with the client and other professionals; formulation of litigation and defense strategies; pleading, discovery and trial preparation and execution; conferences with opposing counsel; and post trial proceedings including various out of state collection options. At the hearing, Shepard testified to the complexity and seriousness of the issues raised in the case, the size of the counterclaims and the potential verdict against Home Savings, and thus, these circumstances all warranted

multiple attorneys working on the matter and the fees incurred. He noted the matter involved a number of cases that were consolidated including several cognovit complaints and a note and mortgage foreclosure complaint, which in his opinion was beyond the typical foreclosure action litigated locally. With this context, we now turn to the attorney fees awarded for the services of each firm, in the order in which they represented Home Savings.

{¶96} Weston provided services from July 10, 2008, through March 6, 2009. A review of the invoices reveals that Weston's scope of services included: pre-litigation services to evaluate, draft and file cognovit complaints and attendant pleadings; obtaining and processing certificates of judgment to pursue collection of judgment in and out of state; bank garnishments, Ferrari seizure attempt and other collection efforts in Wisconsin, Florida, Ohio and Puerto Rico as well as working with local counsel in those efforts; obtaining and reviewing preliminary judicial report and preparing and filing a complaint in foreclosure; defending the Civ.R. 60(B) motions filed by Evergreen, Valdes and Zebrasky which were ultimately successful; defending multiple counterclaims; preparing motions for default and summary judgment against Evergreen, Valdes and Zebrasky; responding to pleadings filed by multiple parties in the foreclosure action including, but not limited to, the Pine Lakes condominium association, the Mahoning County Treasurer and the State of Ohio.

{¶97} Shepard opined that the nature and extent of these services were reasonable in this case, and that Weston is a mid-sized Cleveland firm with a good reputation for business litigation in Northeast Ohio. As noted above, he determined that Weston's hourly rate was a blended average of $159.09 based upon the total amount billed for professional service divided by the hours of work performed. Based upon his experience with the Mahoning County legal community, he opined that Weston's blended average hourly rate was within the range of other well-established and regarded Northeast Ohio law firms.

{¶98} The total amount for professional services billed by Weston was $35,271 and $1,634.97 for costs advanced by the firm. As noted above, multiple entries contained redacted information to preserve privileged information, which

totaled $11,486.29 in billing entries which Shepard could not evaluate for reasonableness. Thus, he deducted that amount, and opined that the net amount of $23,784.71 for professional services and $1,634.97 in costs were reasonable for the services performed by Weston.

{¶99} Messana is based in Fort Lauderdale, Florida and provided services from November 11, 2008 through January 21, 2009 in connection with the domestication of a foreign judgment in Puerto Rico and collection avenues. A review of the invoices reveals that Messana's scope of services included conferring with other professionals, asset search, filing and pursuing judgment. Shepard opined that the hourly rates of $365 and $145 were reasonable for out of town counsel performing work of the type done by Messana in the South Florida legal community. The total amount for professional services billed by Messana was $1,694.50 and $303.18 for costs advanced by the firm, which Shepard deemed reasonable. As noted above, multiple entries in the Messana invoices contained redacted information to protect privileged information, which Shepard opined with respect to Weston and Cavitch, he could not evaluate those entries for reasonableness. However he did not make any deduction for the redacted entries in the Messana invoices. Had he done so consistent with his rationale for doing so with both Weston and Cavitch's invoices, $1,520.50 would have been deducted for a net amount of $174 for professional services and $303.18 for costs advanced by Messana.

{¶100} Cavitch provided services from March 3, 2009 through April 28, 2011. A review of the invoices reveals that Cavitch's scope of services among six cases involving the parties included: continuing with the defense of the motions for relief from judgment, pursuing summary judgment and defending counterclaims filed by Evergreen, Valdes and Zebrasky and cross-claims file by other parties to the foreclosure action; document review and consultation with the client, other professionals and opposing counsel; collection efforts; filing and defending a variety of pre-trial procedural motions and issues, including but not limited to temporary restraining order and preliminary injunction; seeking and responding to discovery, including interrogatories, requests for admissions and multiple depositions involving

thousands of documents; preparing for and attending a variety of court hearings and conferences; interacting with other interested parties to the foreclosure litigation, for example, the condominium owners association; drafting and filing extensive pleadings and notices; prepare for and present a five day trial; obtain and review Spanish translation of documents; prepare for and attend post-trial proceedings including preparing and filing post-trial briefs, transcript review; preparing and presenting attorney fee request.

**{¶101}** Shepard opined that the nature and extent of these services were reasonable in this case, and that Cavitch, founded in the late 1800's was one of the oldest firms in Cleveland and has an excellent reputation in the Northeast Ohio legal community with a highly regarded business litigation practice. The hourly rates for professionals at Cavitch ranged between $135-$325 and $335-$345. Based upon his experience with the Mahoning County legal community, he opined that the hourly rates for the professionals and attorneys at Cavitch were within the range of other well-established and highly regarded Northeast Ohio firms. Shepard noted that Attorney DiPalma, Cavitch's lead counsel for Home Savings, is an adjunct university professor teaching principles of federal litigation and contract law, and a contributing editor of the Ohio Transaction Guide legal treatise. He also testified that there are attorneys practicing in Mahoning County that bill in excess of $345 an hour.

**{¶102}** The total amount of Cavitch's invoices was $365,868.50, which the firm reduced by $21,000 for work performed by new associates which Cavitch deemed to be training costs for the firm; thus Home Savings' was billed $344,868.50 for professional services and $19,700.06 for costs advanced by the firm. As noted above, multiple entries contained redacted information to preserve privileged information, which totaled $12,935.50 in billing entries which Shepard could not evaluate for reasonableness. Thus, he deducted that amount, and opined that the net amount of $330,194.50 for professional services and $19,700.06 in costs were reasonable for the services performed by Cavitch.

**{¶103}** Based upon the record, the magistrate found that the attorney fees incurred were reasonable as contemplated by R.C. 1319.02 (former R.C. 1301.21),

and making the deductions for the $21,000 credit by Cavitch, and $11,486.29 from Weston's billings and $12,935.50 from Cavitch's billings for redacted billing entries that Shepard could not evaluate for reasonableness, the magistrate awarded Home Savings attorney fees against Evergreen as follows: $23,784.71 in fees and $1,634.97 in costs billed by Weston; $1,694.50 in fees and $303.18 in costs billed by Messana; and $330,194.50 in fees and $21,326.16 in costs billed by Cavitch.

{¶104} The magistrate did not abuse his discretion in finding the services provided and the costs incurred by the three firms representing Home Savings were reasonable. This was a multi-million dollar, multi-document commercial loan litigation which evolved over a period of years and spawned six lawsuits involving complex and protracted proceedings, and involving multiple parties beyond Home Savings, Evergreen, Valdes and Zebrasky. However, there were numerical errors in the attorney fees award.

{¶105} First, as noted above, $1,520.50 in billing entries for Messana's professional services contained redacted attorney-client information precluding Shepard from opining on and the magistrate determining their reasonableness. Thus, Home Savings' attorney fees award must be reduced by that amount. Second, regardless of what evidence of the amount was presented, Shepard opined that $19,700.06 in costs advanced by Cavitch was reasonable; however, the magistrate awarded $21,326.16 in costs. Thus, Home Savings' attorney fees award must be reduced by the difference, $1,626.10. Accordingly, Evergreen and Valdes' tenth assignment of error is meritorious in part, and a reduction of the attorney fees award against Evergreen in the amount of $3,146.60 is warranted.

{¶106} In Evergreen and Valdes' eleventh assignment of error, they argue that the trial court erred in placing the attorneys' fees higher in priority than the notes as a matter of law and as a matter of equity. As this presents a question of law, de novo review is applied. Evergreen and Valdes appear to argue that it would be improper to give the attorneys' fees secured status by giving them priority over the mortgages which have been determined to have the first and best lien on the Pine Lake parcels.

{¶107} Home Savings argues that attorneys' fees are authorized in the mortgage agreements which contain a broad clause that gives Home Savings discretion to apply payments in any manner it sees fit allowing them to apply the payment against the attorneys' fees before the mortgages.

{¶108} R.C. 1309.615(A) provides that "[a] secured party shall apply or pay over for application the cash proceeds of disposition under section 1309.610 of the Revised Code[7] in the following order to: (1) [t]he reasonable expenses of retaking, holding, preparing for disposition, processing, and disposing, and, to the extent provided for by agreement and not prohibited by law, reasonable attorney's fees and legal expenses incurred by the secured party; (2) [t]he satisfaction of obligations secured by the security interest or agricultural lien under which the disposition is made; (3) [t]he satisfaction of obligations secured by any subordinate security interest in or other subordinate lien on the collateral if: (a) [t]he secured party receives from the holder of the subordinate security interest or other lien an authenticated demand for proceeds before distribution of the proceeds is completed; and (b) [i]n a case in which a consignor has an interest in the collateral, the subordinate security interest or other lien is senior to the interest of the consignor; and (4) [a] secured party who is a consignor of the collateral if the secured party receives from the consignor an authenticated demand for proceeds before distribution of the proceeds is completed."

{¶109} R.C. 1309.615 lists attorneys' fees first in the order of distribution and satisfaction of the security interest as second in the order of distribution. Accordingly, the trial court did not err in listing the attorneys' fees higher in priority than the notes, and this argument is meritless.

{¶110} Valdes also advanced this argument as a matter of equity. He asserts that the attorneys' fees were awarded against Evergreen, not Valdes, and since Evergreen's only asset is the property, placing the attorneys' fees ahead of the mortgages will result in a deficiency judgment that Valdes will be forced to pay even though the fees were not awarded against him.

{¶111} R.C. 1309.615 provides that attorneys' fees are placed higher than a

---

[7] R.C. 1309.610 provides for the disposition of collateral after default.

security interest in the order of distribution. There is no exception for an equity argument and Valdes does not draw this Court's attention to any. Valdes' equity argument is meritless. Accordingly, for all these reasons, Evergreen and Valdes' eleventh assignments of error regarding the priority of attorney fees is meritless.

**Conclusion**

{¶112} For the reasoning stated above, Evergreen, Valdes and Zebrasky's assignments of error are meritless regarding: discovery; Evergreen, Valdes and Zebrasky's separate defenses and counterclaims, specifically the timeliness of Valdes and Zebrasky's asserted status as accommodation makers and claims of promissory estoppel and negligent misrepresentation; the amount of judgment and damages; and finally, the priority assigned to the attorney fees award. However, the assigned error regarding the amount of the attorney fees award is meritorious in part. Accordingly, the judgment of the trial court is affirmed in part, reversed in part and modified; the judgment entered in favor of Home Savings against Evergreen for reasonable attorney fees and costs of $378,938.02 is reduced by $3,146.60 and modified to $375,791.42.

Celebrezze, Jr. J., of the 8th Appellate District, sitting by assignment, concurs.

Keough, J., of the 8th Appellate District, sitting by assignment, concurs.